RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0091P (6th Cir.)
File Name: 03a0091p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ROBERT MOSS (99-1951; 01-1797) and RONALD KOHN (01-1610),
    *Petitioners-Appellants,*

*v.*

UNITED STATES OF AMERICA,
    *Respondent-Appellee.*

Nos. 99-1951;
01-1610/1797

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
Nos. 97-72174; 97-72435—Patrick J. Duggan,
District Judge.

Argued: April 25, 2002

Decided and Filed: March 26, 2003

Before: DAUGHTREY and MOORE, Circuit Judges;
ECONOMUS, District Judge.[*]

---

[*] The Honorable Peter C. Economus, United States District Judge for the Northern District of Ohio, sitting by designation.

---

## COUNSEL

**ARGUED:** Clifford J. Barnard, Boulder, Colorado, Carole M. Stanyar, Detroit, Michigan, for Appellants. Kathleen Moro Nesi, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee. **ON BRIEF:** Clifford J. Barnard, Boulder, Colorado, Carole M. Stanyar, Detroit, Michigan, for Appellants. Jonathan Tukel, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee.

---

## OPINION

---

PETER C. ECONOMUS, District Judge.

### I. OVERVIEW

The petitioners - appellants, Ronald Kohn ("Kohn") and Robert Moss ("Moss"), appeal separate orders of the district court denying their motions to vacate their convictions and sentences pursuant to 28 U.S.C. § 2255. On appeal, the petitioners assert that their joint representation by defense counsel created an actual conflict of interest which rendered defense counsel's assistance constitutionally ineffective. The petitioners specifically assert that their "joint, overlapping, and contemporaneous" representation precluded defense counsel from obtaining separate plea agreements with the government, particularly plea agreements requiring cooperation.

In addition, Petitioner Kohn asserts that defense counsel labored under a separate conflict of interest arising from an investigation into defense counsel's alleged interference with a government witness.

Although we conclude that defense counsel's conduct fell below the boundary of professional competence, we nevertheless determine that the petitioners failed to demonstrate that the alleged conflicts of interest adversely affected counsel's performance.

Accordingly, we **AFFIRM** the orders of the district court and deny the requested relief.

## II.  FACTUAL HISTORY

Because our inquiry into the existence of an actual conflict of interest requires an examination of the facts giving rise to the conflict, we briefly set forth the factual predicate of the case.

*The Pre-Indictment Proceedings*

In March 1989, federal law enforcement officials arrested four individuals involved in a conspiracy to import marijuana from Mexico into the United States.  Information obtained from these arrests implicated Moss as an integral member of the conspiracy.[1]

Moss became aware of the government's investigation and contacted a friend and criminal attorney, David Morreale ("Attorney Morreale").[2]  Attorney Morreale subsequently enlisted the services of a more experienced federal criminal defense attorney, Timothy Murphy ("Attorney Murphy").  By letter dated August 24, 1990, Attorney Morreale assured Moss that the two attorneys would "be working close together" to resolve the matter.

Attorney Murphy immediately began to pursue several efforts in Moss's defense.  First, Attorney Murphy issued a letter to United States Attorney Stephen Markman ("Markman") indicating that he represented Moss and that Markman was "free to contact [him] to arrange for an interview with Mr. Moss, where it seems likely that [Moss] will provide information."  The letter also complained of the allegedly unprofessional tactics utilized by the United States Marshal's Office and the United States Customs Service during the investigation.

Attorney Murphy additionally began investigating the identities of those individuals providing information against Moss.  The investigation uncovered a relationship between Moss and Eli Moreno ("Moreno"), one of the four individuals arrested in March, 1989.  Attorney Murphy subsequently traveled to Arizona and obtained discovery (i.e., the court file) regarding Moreno's potential cooperation.

*The Indictment and Arraignment*

Notwithstanding Attorney Murphy's efforts, on March 4, 1991, a federal grand jury in the Eastern District of Michigan issued an Indictment against, *inter alia,* Moss and Kohn charging each with one count of conspiracy to import marijuana in violation of 21 U.S.C. §§ 952 and 960, and one count of conspiracy to distribute marijuana in violation 21 U.S.C. §§ 841 and 846.  Three days later, law enforcement officers arrested Moss and Kohn.

At the arraignment, Attorney Murphy entered an appearance on behalf of Moss.  Attorney Murphy also entered an Appearance on behalf of Kohn.[3]

---

[1] For a thorough discussion concerning the scope and details of the conspiracy, see *United States v. Moss*, 9 F.3d 543 (6th Cir. 1993) (affirming the petitioners' convictions and sentences on direct appeal).

[2] Moss received a letter from the government indicating that he was the target of a federal investigation.

[3] The record yields conflicting testimony as to whether Attorney Murphy met Kohn just prior to the arraignment, or whether the two had met earlier.  We need not resolve the issue as it is of little relevance to the ultimate resolution of the case.

By letter dated March 11, 1991 (the "Appearance letter"),[4] Attorney Morreale entered an Appearance on behalf of Moss. However, Attorney Murphy did not withdraw as Moss's counsel.

*The March 21, 1991 Meeting*

On March 21, 1991, indicted co-conspirator David Jaeger ("Jaeger") and his attorney, Ron Kappleman ("Attorney Kappleman"), traveled from South Dakota to Detroit, Michigan for Jaeger's arraignment. Following the arraignment, Attorney Kappleman met with AUSA Janice to discuss Jaeger's potential cooperation with the government.[5] At the conclusion of these discussions, Attorney Kappleman unexpectedly discovered Attorney Murphy waiting for him outside of AUSA Janice's office. Attorney Murphy invited Attorney Kappleman and Jaeger back to his office in order to exchange discovery, particularly information regarding the cooperation of the Arizona witnesses.[6]

---

[4] The district court did not file Attorney Morreale's Appearance until April 3, 1991. The United States Attorney's Office also received the Appearance letter on April 3, 1991. Nevertheless, Assistant United States Attorney Lee Janice ("AUSA Janice"), the prosecutor assigned to the case, testified that he was aware prior to receipt of the Appearance letter that Attorney Morreale represented Moss and Attorney Murphy represented Kohn.

[5] AUSA Janice also discussed Jaeger's cooperation during the months prior to the issuance of the Indictment.

[6] AUSA Janice had denied Attorney Kappleman's requests for information regarding the identity of witnesses cooperating with the government.

Upon arriving at Attorney Murphy's office, Attorney Kappleman and Jaeger encountered Moss and Kohn.[7] Attorney Murphy provided Attorney Kappleman with several hundred pages of documents and discussed with him the identities of potential cooperating witnesses. At some time during this discussion, Moss and Jaeger exited the meeting and retreated outdoors. While outside, Moss asked Jaeger to offer a potential witness $25,000.00 in exchange for either favorable testimony, or a refusal to testify. *See also Moss*, 9 F.3d at 548. Jaeger agreed to bribe the potential witness.

*The April, 1991 Meeting*

Attorney Murphy subsequently directed complaints to United States Attorney Markman and AUSA Janice regarding the latter's persistence in withholding the identities of cooperating witnesses. In an effort to alleviate these concerns, Markman directed AUSA Janice to schedule a meeting with Attorney Murphy.

At some stage during that meeting, held in early April, 1991,[8] Attorney Murphy attempted to predict the names of those witnesses that he believed were cooperating against Kohn. AUSA Janice declined to verify or deny Attorney Murphy's predictions, but stated, "You know, if your client wants to cooperate, it would be in his best interest to do so soon."

---

[7] As discussed, *infra*, at 19-20, Attorney Morreale was absent from the meeting as he was in the hospital recovering from injuries sustained in an automobile accident.

[8] There are discrepancies in the record as to the exact date of the meeting, however, it is undisputed that the meeting occurred between April 2 - 4, 1991.

*The Superceding Indictments*

Several weeks later, on April 25, 1991, Jaeger entered into an agreement with the government whereby he agreed to cooperate against Kohn and Moss in exchange for a sentence of thirty-six (36) months in prison.[9]   On April 26, 1991, the grand jury issued a Superceding Indictment containing additional defendants and adding criminal forfeiture charges against Moss and Kohn.

On August 15, 1991, the government obtained a Second Superceding Indictment based, in part, on Jaeger's cooperation.  The Second Superceding Indictment charged Moss with continuing to act in furtherance of the conspiracy by soliciting Jaeger to bribe a potential government witness. The Second Superceding Indictment additionally increased the quantity of marijuana involved in the conspiracy from the fifty (50) kilograms alleged in the original Indictment to over 1,000 kilograms.

*The Proceedings Below*

A jury trial commenced in the district court on September 6, 1991.  Attorney Murphy represented Kohn and Attorney Morreale represented Moss.   Thirteen days of testimony from forty-two witnesses revealed a marijuana smuggling operation spanning at least eight years and involving fourteen participants.  *See Moss*, 9 F.3d at 548.

The jury returned verdicts of guilt on each count of the Second Superseding Indictment relevant to the petitioners. At the sentencing hearing, the district judge imposed concurrent 188-month sentences on Kohn, as well as concurrent 292-

---

[9]The district court initially sentenced Jaeger to a 120 month period of incarceration.  In accordance with the plea agreement, the government filed a motion to reduce Jaeger's sentence pursuant to FED. R. CRIM. P. 35 and the district court ultimately reduced Jaeger's sentence to thirty-six months.

month sentences on Moss.[10]  Moss and Kohn appealed their convictions and sentences and this Court affirmed. *See Moss*, 9 F.3d 543.

Moss and Kohn thereafter filed separate motions to vacate, correct, or set aside their sentences pursuant to 28 U.S.C. § 2255.  In said motions, Moss and Kohn alleged, *inter alia*, that they had received ineffective assistance of counsel because: (1) defense counsel failed to advise them of a plea offer extended by the government; (2) defense counsel provided misleading advice regarding sentencing exposure; and (3) conflicts of interest arose from Attorney Murphy's joint representation of their defense, as well as from the investigation into Attorney Murphy's role in the solicitation of Jaeger. *Id*.

On June 14, 1999, the district court denied the petitions.[11] *Kohn v. United States*, No. 97-CV-72174-DT, 1999 U.S. Dist. LEXIS 10165 (E.D. Mich June 14, 1999).  Moss timely appealed the denial to this Court,[12] and the district court granted a Certificate of Appealability to Moss on the "issue of the denial of effective assistance of counsel at the plea stage."

Kohn meanwhile filed a motion to alter or amend judgment pursuant to Rule 59 (e) of the Federal Rules of Civil

---

[10]The district court determined that the quantity of marijuana attributable to each petitioner was 3,000 kilograms. *Moss*, 9 F.3d at 552-53. Moss received a greater sentence, however, because he was charged as the leader of the conspiracy and he received an upward adjustment for obstruction of justice in relation to the solicitation of Jaeger. *Moss*, F.3d 553-54.

[11]The trial judge, Hon. Horace W. Gilmore, retired prior to rendering a determination on the motion.  The cases thereafter were transferred to the docket of the Hon. Patrick J. Duggan, who denied the requested relief.

[12]Moss also filed a motion pursuant to Rule 60 (b)(6) of the Federal Rules of Civil Procedure on the same day that he filed the Notice of Appeal.  The district court denied the motion on September 27, 1999.

Procedure. The district court denied Kohn's motion except to grant an evidentiary hearing "with respect to [the] claim of ineffective assistance of counsel at the plea stage." This Court remanded Moss's case to the district court for a consolidated evidentiary hearing.[13]

Prior to the evidentiary hearing, Moss and Kohn sought leave to amend their petitions in light of *Apprendi v. New Jersey*, 530 U.S. 466 (2000). The district court denied the motions, reasoning that, "[b]ecause *Apprendi* does not apply retroactively to cases on collateral review . . . the claims Petitioners seek to assert by amendment are futile, and therefore, Petitioners' motions for leave to amend shall be denied."

The district court held a three-day evidentiary hearing in January, 2001, during which the petitioners presented testimony in support of their allegations regarding counsel's deficient performance during the plea stage, as well as Attorney Murphy's conflict of interest. After consideration of the evidence, the district court issued thorough orders denying the petitioners' claims.

In denying the claims, the district court determined that because the government had not extended a plea offer to the petitioners, defense counsel "[could not] be said to have been ineffective for failing to advise the petitioner[s] of a plea offer that did not exist." The district court similarly rejected the petitioners' claims regarding the allegedly erroneous sentencing advice, reasoning:

[E]ven if the [c]ourt were to assume that such incorrect advice was given, and that such advice constituted deficient performance . . . the [p]etitioner[s] were not prejudiced by such advice . . . .[Defense counsel's] allegedly incorrect advice could not have influenced [p]etitioner[s'] decision to accept a plea offer because, as the Court has already indicated, there was never any plea offer to accept.

The district court also rejected the petitioners' claims regarding the failure of defense counsel to initiate plea negotiations, determining, "there is no constitutional right to plea bargain." The district court reasoned that defense counsel's alleged failure to pursue plea negotiations derived from the petitioners' protestations of innocence, as well as the petitioners' unwillingness to cooperate against each other.

Nevertheless, the district court acknowledged that the petitioners could succeed on a conflict of interest claim so long as a conflict of interest prevented defense counsel from exploring plea negotiations. The district court examined the petitioners' allegations of a conflict of interest arising from joint representation and determined that the petitioners "failed to persuade the [c]ourt that dual representation existed in this case" because "it was never [Attorney Murphy's] intention to represent [Moss] during trial as [Moss] was Attorney Morreale's client."

The district court uncovered, however, a separate potential conflict of interest arising from Moss's payment of Kohn's legal fees. The district court observed, "some if not all of the funds for representing [Kohn] came from co-defendant Moss." The district court ultimately concluded that the fee arrangement did not adversely affect the petitioners' defense because "the [petitioners] would not have entertained the idea of pleading and testifying against the co-defendant . . . [therefore] any choice by Attorney Murphy to forgo initiating plea negotiations was not harmful to the [petitioners]."

---

[13]Moss filed a Limited Motion of Remand in this Court seeking to consolidate his action with the evidentiary hearing relating to Kohn's claims. This Court denied Moss's request "without prejudice to its resubmission in the event the district court certifies that it is inclined to grant a joint hearing." The district court subsequently certified its inclination to grant a joint evidentiary hearing and this Court remanded the matter.

Consequently, the district court rejected the petitioners' conflict of interest claims.

Kohn immediately appealed the district court's denial, and the district court granted a Certificate of Appealability.[14] Moss subsequently re-filed his Notice of Appeal as to the "issue of the denial of effective assistance of counsel at the plea stage."

## III. STANDARD OF REVIEW

Title 28 of the United States Code section 2255 provides, in relevant part:

A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255. In order to prevail upon a section 2255 motion, the petitioners "must allege one of three bases: (1) an

---

[14]The district court granted the Certificate of Appealability as to five issues: (1) whether Kohn was denied the effective assistance of counsel in the plea stage of the proceedings as a result of Attorney Murphy's "earlier, ongoing, and simultaneous representation of a co-defendant in the same indictment;"(2) whether Kohn should have been permitted to amend his petition in light of *Apprendi*; (3) whether Kohn was denied effective assistance of counsel at trial due to counsel's "prior and contemporaneous representation of a co-defendant, and also due to defense counsel's belief and fear during trial that he was being investigated in a scheme to bribe a witness;"(4) whether Kohn was denied effective assistance of counsel at sentencing; and (5) whether Kohn was denied the effective assistance of counsel on appeal.

error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid." *Weinberger v. United States*, 268 F.3d 346, 351 (6th Cir. 2001).

The role of the appellate court on habeas review "is not to speculate" but "to defer to the District Court's factual findings unless [the appellate court] can conclude they are clearly erroneous." *Mickens v. Taylor*, 535 U.S. 162, 122 S. Ct. 1237, 1246, 152 L. Ed. 2d 291(2002) (Kennedy, J., concurring) (citing *Lackawanna County District Attorney v. Coss*, 532 U.S. 394 (2001)). This Court employs a *de novo* review of a district court's denial of a section 2255 motion, while examining the district court's factual findings for clear error. *Gall v. United States*, 21 F.3d 107, 109 (6th Cir. 1994). "'Clear error' occurs only when we are left with the definite and firm conviction that a mistake has been committed. If there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *United States v. Kellams*, 26 F.3d 646, 648 (6th Cir. 1994) (citing *Anderson v. Bessemer City*, 470 U.S. 564, 573-74 (1985)).

## IV. ANALYSIS

### A. Conflict of Interest

The Sixth Amendment provides that a criminal defendant shall have the right to "the Assistance of counsel for his defence." U.S.CONST. amend. VI. The Sixth Amendment affords this right because of the effect that such assistance "has on the ability of the accused to receive a fair trial." *United States v. Cronic*, 466 U.S. 648, 658 (1984). Derivative of the right to counsel under the Sixth Amendment is the right to have counsel provide effective assistance, *see McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970), and "assistance which is ineffective in preserving fairness does not meet the

constitutional mandate," *Mickens*, 122 S. Ct. at 1240 (citing *Strickland v. Washington*, 466 U.S. 668, 685-86 (1984)).

As a general matter, a defendant alleging ineffective assistance of counsel must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id. See also Bell v. Cone*, 535 U.S. 685, 122 S. Ct. 1843, 1850, 152 L. Ed. 2d 914 (2002) ("Without proof of both deficient performance and prejudice to the defense, [under *Strickland*] . . . it could not be said that the sentence or conviction resulted from a breakdown in the adversary process that rendered the result of the proceeding unreliable, and the sentence or conviction should stand.") (Internal quotation marks and citation omitted).

In certain Sixth Amendment contexts, the court will discharge the defendant's *Strickland* obligation to demonstrate a probable effect on the outcome and instead presume such prejudice. *Mickens*, 122 S. Ct. at 1240-41(citing *Cronic*, 466 U.S. at 658-59; *Geders v. United States*, 425 U.S. 80, 91 (1976); *Gideon v.Wainwright*, 327 U.S. 335, 344-45 (1963)). This presumption of prejudice arises in circumstances where: (1) there exists a "complete denial of counsel" or a denial of counsel "at a critical stage" of the defendant's trial; (2) defense counsel fails to "subject the prosecution's case to meaningful adversarial testing"; or (3) counsel "is called upon to render assistance where competent counsel very likely could not." *Cronic*, 466 U.S. at 658-59 (internal citations omitted). It is in the presence of these "circumstances of magnitude" where "the likelihood that the verdict is unreliable is so high that a case-by-case inquiry is unnecessary. " *Mickens*, 122 S. Ct. at 1241.

The presumption of prejudice also arises where the defendant demonstrates that his attorney actively represented conflicted interests. *Mickens*, 122 S. Ct. at 1241-45

(examining with approval *Holloway v. Arkansas*, 435 U.S. 475, 488 (1978); *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980); and *Wood v. Georgia*, 450 U.S. 261 (1981)). Indeed, where the defendant or his counsel objects to the conflict prior to, or during trial, the trial court must inquire as to the extent of the conflict or subject any subsequent conviction to automatic reversal. *Holloway*, 535 U.S. at 489-92. *See also Riggs v. United States*, 209 F.3d 828, 831 n.1(6th Cir. 2000). In the absence of an objection, however, a showing of (1) an actual conflict; and (2) an adverse effect on his counsel's performance will void the conviction. *Mickens*, 122 S. Ct. at 1245.

## 1. Joint representation

On appeal, the petitioners assert that their "joint, overlapping, and contemporaneous" attorney-client relationships with Attorney Murphy created an actual conflict of interest that rendered Attorney Murphy unable to explore possible plea opportunities with AUSA Janice. Joint, or dual, representation occurs where a single attorney represents two or more co-defendants in the same proceeding.[15] *See Burger v. Kemp*, 483 U.S. 776, 782 (1987) (quoting *Holloway*, 435 U.S. at 482). While joint representation of co-defendants does not per se constitute ineffective assistance of counsel, *see Thomas v. Foltz*, 818 F.2d 476, 481 (6th Cir. 1987), the Supreme Court repeatedly has cautioned against "the high probability of prejudice arising from multiple concurrent representation, and the danger of proving that prejudice," *Mickens*, 122 S. Ct. at 1245.

---

[15] The courts interchangeably utilize the terms "joint representation," "dual representation," and "multiple representation," to indicate the simultaneous representation of two or more co-defendants by single attorney. However, joint and dual representation refer to simultaneous representation occurring in the same proceeding, while multiple representation refers to simultaneous representation in separate proceedings. *See generally Duncan v. Morton*, 256 F.3d 189 (3d Cir. 2001).

Joint representation of conflicting interests is suspect because of what it tends to prevent the attorney from doing . . . the evil -- it bears repeating -- is in what the advocate finds himself compelled to refrain from doing, not only at trial but also as to possible pretrial plea negotiations and in the sentencing process . . . . The mere physical presence of an attorney does not fulfill the Sixth Amendment guarantee when the advocate's conflicting obligations have effectively sealed his lips on crucial matters.

*Holloway*, 435 U.S. at 490.

It is apodictic that the Sixth Amendment's guarantee of effective assistance of counsel encompasses the attorney's obligation to avoid conflicts of interest arising from joint representation during the plea stage of the proceedings. *See Holloway*, 435 U.S. at 490 ("[I]n this case [a conflict of interest] may well have precluded defense counsel . . . from exploring possible plea negotiations and the possibility of an agreement to testify for the prosecution, provided a lesser charge or a favorable sentencing recommendation would be acceptable."). This Court has held that an attorney provides ineffective assistance where joint representation compels the attorney to forgo plea negotiations on one client's behalf. *See United States v. Hall*, 200 F.3d 962, 966 (6th Cir. 2000) ("Foregoing plea negotiations is proof of an actual conflict of interest.") (Citation omitted).

As discussed, *supra*, the district court explicitly rejected the petitioners' assertions that Attorney Murphy engaged in joint representation. The district court specifically determined:

Attorney Murphy testified that it was never his intention to represent [Moss] during trial as [Moss] was Attorney Morreale's client. Attorney Morreale also testified that Attorney Murphy entered an appearance on behalf of [Moss] at the arraignment only because Attorney Morreale was unable to attend the arraignment.

Sometime shortly thereafter, it was definitely settled that Attorney Murphy would represent Kohn and Attorney Morreale would represent [Moss].

The record supports the district court's conclusion as to the absence of joint representation. The record indicates that it was defense counsel's general practice to refrain from representing co-defendants. In accordance with this practice, Attorneys Morreale and Murphy reached an agreement whereby Attorney Morreale would represent Moss and Attorney Murphy would represent Kohn. Attorney Murphy testified:

It was always clear to me that Mr. Morreale intended to represent Mr. Moss. I don't know why -- as we sit here today I don't know why I filed that appearance because it was never my intention to ever represent [Moss] at trial. [Moss] was Mr. Morreale's client and it was clear to me. It may have been -- I don't know why Mr. Morreale didn't file the appearance, but I never intended to represent [Moss] at trial.

Attorney Murphy further testified:

[Moss] doesn't want me. He wants Mr. Morreale. Mr. Morreale is a lawyer who he trusts, who he has dealt with before, who brought him in and he doesn't want me.
. . . .
Mr. Morreale was a very successful lawyer, a very successful federal lawyer and it wasn't a secret to many of his clients. Are you asking me whether I would have preferred to represent Mr. Moss? The answer would be, yes, but Mr. Moss was Mr. Morreale's client.

While the record lacks the precise moment when defense counsel agreed to provide Moss and Kohn with separate representation, the agreement was apparent to other individuals involved in the earliest stages of the proceedings. For instance, Attorney Kappleman testified that he was aware

during the March 21, 1991 meeting that Attorney Morreale represented Moss. AUSA Janice also testified that he was aware prior to his April, 1991 meeting with Attorney Murphy that Moss and Kohn were represented by separate counsel. Furthermore, it is undisputed that the petitioners maintained separate representation at trial and neither defense counsel, AUSA Janice, nor the trial judge expressed any concern over the petitioners' separate representation.[16]

The petitioners allege that joint representation pervaded their defense because Attorney Murphy provided each of them with substantive legal advice throughout the pre-trial and trial phases of the proceedings. Moss alleges specifically that he visited Attorney Murphy's office without Attorney Morreale on several occasions where substantive legal discussions took place. Members of the petitioners' families further testified that Attorney Murphy appeared to represent the petitioners throughout the pre-trial and trial proceedings.

The district court considered these assertions and determined:

> [Kohn] and co-defendant Moss knew that Attorney Murphy and Attorney Morreale were working together and, in fact, that the four of them were all working toward the common goal of a favorable verdict for both defendants. While the [c]ourt accepts the testimony that there were times when co-defendant Moss visited Attorney Murphy's office to pick-up and deliver materials and, in fact, may have engaged in conversations with Attorney Murphy without [Kohn] or Attorney Morreale being present, this [c]ourt is satisfied that Attorney Murphy was not giving "legal advice" to co-defendant Moss and that co-defendant Moss at all times knew that Morreale was his attorney.

---

[16]*See* discussion *infra* at part-VI.

The district court rendered this determination after considering a record replete with conflicting testimony from witnesses, many of whom were unable to obtain full recall of a trial that concluded nearly a decade prior to the evidentiary hearing. Such is the challenge generally presented to the district court on habeas review, and this Court will not disturb the district court's factual findings, particularly determinations regarding witness credibility, absent clear error. *See Burger*, 483 U.S. at 785 ("The district judge, who presumably is familiar with the legal talents and character of the lawyers who practice at the local bar and who saw and heard the witness testify, is in a far better position than we are to evaluate a charge of [conflict of interest] . . . .").

In an effort to demonstrate clear error, Moss points to Attorney Morreale's absence at the March 21, 1991, meeting as evidence of Attorney Murphy's joint representation. Our review of the record demonstrates that Moss misplaces his reliance on this alleged evidence.[17]  It is undisputed that

---

[17]We note that on direct appeal a prior panel of this Court determined that "Murphy represented Moss [during the March 21, 1991 meeting] and ultimately at trial." *Moss*, 9 F.3d at 548. We acknowledge that under the law of the case doctrine, a court ought not reopen issues decided at an earlier point in the same litigation. *See Agostini v. Felton*, 521 U.S. 203, 236 (1997). "Issues decided at an early stage of the litigation, either explicitly or by necessary inference from the disposition, constitute the law of the case." *Hanover Ins. Co. v. American Eng'g Co.*, 105 F.3d 306, 312 (6th Cir. 1997) (citation and quotation marks omitted). The doctrine of law of the case is "not an inexorable command," and courts must use "common sense" in applying it. *See id.* Here, the prior panel neither addressed the issue of joint representation, nor had occasion to consider the record developed on collateral review. Having the opportunity to examine the extensive testimony presented during the evidentiary hearing, we respectfully disagree with the prior panel's finding and reach the conclusion presented herein. *Id.* (citing *Great Lakes Dredge & Dock Co. v. Tanker*, 957 F.2d 1575, 1578 (11th Cir.1992) (discussion of issues not before the court constitutes dicta); 1B J.A.MES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 0.404[1], at II-5 (2d Ed. 1996) (law of the case doctrine applies to issues "fully briefed and squarely decided" in the first appeal).

Attorney Murphy continuously provided Attorney Morreale with discovery obtained from Arizona and invited Moss and Attorney Morreale to attend the March 21, 1991, meeting in order to review such discovery. Contrary to Moss's assertions of joint representation, Attorney Morreale was absent from the meeting because he was recovering from injuries sustained in an automobile accident. Furthermore, as indicated, *supra*, Attorney Kappleman understood during this meeting that Attorney Morreale represented Moss.

Moss's separate meetings with Attorney Murphy require closer scrutiny. It is undisputed that Moss arrived alone at Attorney Murphy's office on at least six occasions following the arraignment. Attorney Murphy described these visits as instances where Moss would "drop things off and picks things up." Attorney Murphy expressly denied having any "substantive discussion of evidence" with Moss during these occasions, but acknowledged that he provided Moss with "copies of motions" and that, if Moss had a question regarding the case, he "would have been happy" to provide a response. For his part, Moss testified that he was unable to recall any specific discussions with Attorney Murphy, but he was confident that he and Attorney Murphy discussed the case during these meetings, including having conversations regarding "who was cooperating," "what kind of chances" faced the petitioners, and "what options [were] available." The record indicates, therefore, that Attorney Murphy's post-arraignment encounters with Moss may have comprised more than the delivery and receipt of discovery materials.

While the Court acknowledges the potential ethical risks posed by defense counsel meeting with a represented co-defendant in the absence of the co-defendant's counsel, on the entirety of the record presented herein, we are unwilling to disturb the district court's determination that Attorney Murphy did not provide "legal advice" during these post-arraignment visits with Moss. *Cf. Nix v. Whiteside*, 475 U.S. 157, 165 (1986) ("[B]reach of an ethical standard does not necessarily make out a denial of the Sixth Amendment

guarantee of assistance of counsel.") Absent any specific and credible evidence as to the nature of these discussions, it would be mere speculation for this Court to conclude that Attorney Murphy provided any assistance that would create, or continue, an attorney-client relationship with Moss. Indeed, such a conclusion would be contrary to the entirety of the record. Attorney Murphy repeatedly testified that he was aware of the risks of joint representation and that he would not have provided substantive legal advice to Moss "without Mr. Morreale being present under any circumstance and [Attorney Murphy] probably wouldn't do it with Mr. Morreale present." Moreover, the district court expressly questioned the credibility of Moss's testimony at the evidentiary hearing, noting that "the [c]ourt is mindful of the fact that [Moss] acknowledged that when it was in his interest to do so, he gave false testimony under oath at trial." We therefore are unable to conclude that the district court clearly erred in its determination regarding Attorney Murphy's post-arraignment contact with Moss.

As we accept the district court's finding that Attorney Murphy provided only de minimis assistance to Moss, we necessarily determine that Attorney Murphy's post-arraignment contact with Moss failed to give rise to attorney-client relationship. *Cf. Riggs*, 209 F.3d at 833 (determining that defense counsel's de minimis assistance in arguing for an extension of time on behalf of two co-defendants failed to create to an attorney-client relationship giving rise to a conflict of interest). Consequently, the petitioners have failed to demonstrate that Attorney Murphy engaged in joint representation during the post-arraignment proceedings.

## 2.   Successive representation

Although we concur in the district court's finding that "Attorney Murphy never intended to represent Moss *at trial*," the record reveals that Attorney Murphy developed an attorney-client relationship with Moss during the pre-indictment proceedings.    Following Moss's initial consultation with counsel, Attorney Morreale assured Moss that he and Attorney Murphy "would be working close together" to resolve the matter.  Attorney Murphy thereafter advanced several efforts on Moss's behalf, including corresponding with United States Attorney Markman and traveling  to Arizona for the purposes of investigating potential witnesses.  During the evidentiary hearing, Attorney Murphy acknowledged that these activities created an "attorney-client relationship."   While this attorney-client relationship ceased shortly after the arraignment, it is with little hesitation that we conclude that Attorney Murphy represented Moss during the pre-indictment period.

Attorney Murphy's pre-indictment representation of Moss, and subsequent  representation of Kohn, presents the issue of whether Attorney Murphy labored under an  actual conflict of interest  arising   from   these   successive   representation. Successive representation occurs where defense counsel has previously represented a co-defendant or trial witness.[18]  *See generally Riggs*, 209 F.3d at 833-34.  "Conflicts may arise when  an  attorney  simultaneously  represents  clients  with differing  interests  (multiple  representation),  or  when  an attorney representing a defendant has previously represented co-defendants or trial witnesses (successive representation)." *United States v. Shepard*, 675 F.2d 977, 979 (8th Cir. 1982). It  is  more  difficult  for  a  defendant  to  show  that  counsel

---

[18]The Michigan Rules of Professional Conduct place similar restrictions  on  an  attorney's  ability  to  represent  a  client  if  the representation is "directly adverse" to the representation of an attorney's former client.    *See*  Rule  1.9  of  the  Michigan  Rules  of  Professional Conduct.  *See also People v. Gallagher*, 116 Mich. App. 283 (1982).

actively  represented  conflicting  interests  in  cases  of successive rather than simultaneous representation. *See Riggs*, 209 F.3d at 833-34.  *See also Enoch v. Gramely*, 70 F.3d 1490 (7th Cir. 1995); *McConico v. Alabama*, 919 F.2d 1543 (11th Cir.  1990);  *Mannhalt  v.  Reed*,  847  F.2d  576,  580  (9th Cir.1988).

The  fear  in  successive  representation  cases  is  that  the lawyer will fail to cross-examine the former client rigorously for fear of revealing or misusing privileged information.  *See Duncan*, 256 F.3d at 198; *Enoch*, 70 F.3d at 1496; *Mannhalt*, 847  F.2d  at  580.   Thus,  the  most  common  example  of  an actual  conflict  of  interest  arising  from  successive representation occurs where an attorney's former client serves as a government witness against the attorney's current client at trial.  *See*, *e.g.*, *United States v. McCutcheon*, 86 F.3d 187, 189 (11th Cir. 1996); *United States v. Flynn*, 87 F.3d 996 (8th Cir. 1996); *Enoch*, 70 F.3d at 1496; *United States v. Malpiedi*, 62 F.3d 465 (2d Cir. 1995); *Takacs v. Engle*, 768 F.2d 122, 125 (6th Cir. 1985).

As the district court failed to address the issue of successive representation,  it  becomes  the  duty  of  this  Court  to  address whether  Attorney  Murphy's  successive  representations  of Moss and Kohn gave rise to a conflict of interest rendering the petitioners' representation constitutionally ineffective.

Prior to the Supreme Court's decision in *Mickens*, 122 S. Ct. 1240, courts applied the *Sullivan* presumption of prejudice to  conflict  of  interest  claims  arising  from  successive representation. *See Riggs*, 209 F.3d at 831 n.1 ("[T]his circuit applies  the  *Culyer  [v.  Sullivan]*  analysis  to  all  Sixth Amendment conflict of interest claims.") (citing *United States v. Mays*, 77 F.3d 906, 908 (6th Cir. 1996).  *See also Romine v. Head*, 253 F.3d 1349 (11th Cir. 2001); *Perillo v. Johnson*, 205 F.3d 775 (2d Cir. 2000);  *Flynn*, 87 F.3d at 1001;  *Beets v. Collins*, 986 F.2d 1478 (5th Cir. 1993); *Church v. Sullivan*, 942 F.2d 1501, 1511 (10th Cir. 1991); *Mannhalt*, 847 F.2d at

580.[19]    In *Mickens*, however, the Court observed the "holdings of the Courts of Appeals, which applied *Sullivan* unblinkingly to all kinds of attorney ethical conflicts," and cautioned:

> It must be said . . . that the language of *Sullivan* does not clearly establish, or indeed even support, such an expansive application . . . . Both *Sullivan* itself and *Holloway* stressed the high probability of prejudice arising from multiple concurrent representation and the difficulty of proving that prejudice. Not all attorney conflicts present comparable conflicts.

*Mickens*, 122 S. Ct. at 1245 (internal citations and quotations omitted). The Court specifically addressed the issue of successive representation, stating, albeit in dicta, "we do not rule upon the need for the *Sullivan* prophylaxis in cases of successive representation . . . .Whether *Sullivan* should be extended to such cases remains, as far as the jurisprudence of the court is concerned, an open question." *Mickens*, 122 S. Ct. at 1246.

In the wake of *Mickens*, no court has applied the *Sullivan* presumption to a case of successive representation. *See, e.g., Smith v. Hofbauer*, No. 01-1169, 2002 U.S. App. LEXIS 25130, (6th Cir. December 10, 2002) (holding in the context of a section 2254 petition that "*Sullivan* applied only to joint representation and the Supreme Court has yet to extend *Sullivan*'s reach to any other type of conflict."); *Holleman v. Cotton*, 301 F.3d 737, 742- 43 (7th Cir. 2002) ("[T]he Supreme Court recently has cast doubt on whether the principle of *Cuyler v. Sullivan* should be applied to cases

where trial judges have failed to inquire into conflicts of interest in successive representation cases . . . ."); *Montoya v. Lytle*, No. 01-2138, 2002 U.S. App. LEXIS 23888, (10th Cir. November 20, 2002). *But see United States v. Young*, No. 01-3647, 2003 U.S. App. LEXIS 190 n. 5 (8th Cir. January 8, 2003) (noting that *Sullivan* applies to cases of "multiple or serial" representation, while *Strickland* applies to all other ethical conflicts).

As the application of *Sullivan* to cases of successive representation appears to be in doubt, we briefly shall examine the *Mickens* dicta in an effort to discern which standard, *Strickland* or *Sullivan*, appropriately governs the instant appeal.

In explaining its rationale for differentiating between joint and successive representation cases, the *Mickens* Court cited Rule 44 (c) of the Federal Rules of Criminal Procedure which requires "a trial court to inquire into the likelihood of conflict whenever jointly charged defendants are represented by a single attorney . . . but not when counsel previously represented another defendant in a substantially related matter, even where the trial court is aware of the prior representation."[20]    *Mickens*, 122 S.Ct. at 1245 (citations omitted). According to the Court, the distinction between joint and successive representations evident in Rule 44 (c)

---

[19]However, the Fifth Circuit in *Beets* presciently stated, "[w]hile this panel is bound to follow certain precedents utilizing the *Cuyler* standard even when the alleged conflict does not involve multiple representation, the desirability of that approach is not a foregone conclusion . . . . The Supreme Court will have to sort out this quandary." *Beets*, 986 F.2d 1483-84.

[20]Rule 44(c) of the Federal Rules of Criminal Procedure, provides: Whenever two or more defendants have been jointly charged pursuant to Rule 8(b) or have been joined for trial pursuant to Rule 13, and are represented by the same retained or assigned counsel or the same retained or assigned counsel who are associated in the practice of law, the court shall promptly inquire with respect to such joint representation and shall personally advise each defendant of the right to the effective assistance of counsel, including separate representation. Unless it appears that there is good cause to believe that no conflict of interest is likely to arise, the court shall take such measures as may be appropriate to protect each defendant's right to counsel.

supports the exclusive application of *Sullivan* only to instances of joint representation. The Court explained:

> This is not to suggest that one ethical duty is more or less important than another. The purpose of our *Holloway* and *Sullivan* exceptions from the ordinary requirements of *Strickland* . . . is not to enforce the Canons of Legal Ethics, but to apply needed prophylaxis in situations where *Strickland* itself is evidently inadequate to assure vindication of the defendant's Sixth Amendment right to counsel.

*Mickens*, 122 S. Ct. at 1246 (citation omitted). The foregoing rationale reaffirmed the Court's prior concern over the inadequacies of the *Strickland* test when applied to conflict of interest claims. As the Court previously recognized, "in a case of joint representation of conflicting interests the evil . . . is in what the advocate finds himself compelled to *refrain* from doing." *Holloway*, 435 U.S. at 488. *Strickland* places on the party alleging a conflict of interest the onerous burden of having to prove a negative, that is, demonstrating that his counsel improperly *refrained* from acting in a constitutionally-effective manner. The Court therefore created a narrow presumption of prejudice as a necessary prophylaxis against the high probability of prejudice arising in circumstances of "multiple concurrent representation", and the difficulty in proving that prejudice under *Strickland*. *Mickens*, 122 S. Ct. at 1245.

While this Court has not had occasion to address this precise issue, several circuits have reasoned that *Strickland* similarly fails in the successive representation context where the alleging party demonstrates that: (1) counsel's earlier representation of the witness or co-defendant was substantially and particularly related to counsel's later representation of defendant; or (2) counsel actually learned particular confidential information during the prior representation of the witness or co-defendant that was relevant to defendant's later case. *See Enoch*, 70 F.3d at

1496-97 (citing *Smith v. White*, 815 F.2d 1401, 1405 (11th Cir. 1987)). *See also Mannhalt*, 847 F.2d at 580 ("In successive representation, conflicts of interests may arise if the cases are substantially related or if the attorney reveals privileged communications of the former client or otherwise divides his loyalties.") (Citation omitted). An examination of *Mickens* reveals that it is the liberal application of this "substantial relatedness" test that troubled the Court. The *Mickens* Court explicitly indicated that the invocation of a presumption is unnecessary only in factually related cases because there is less likelihood of prejudice in circumstances of "substantially related," as opposed to "multiple concurrent," representations. *Mickens*, 122 S. Ct. at 1245.

We do not make an impermissible leap in predicting that a Supreme Court decision lingers on the horizon that expressly will limit the application of *Sullivan* in cases of successive representation. The eventual scope of this limitation is, however, a matter that we need not address in the case *sub judice* because the instant scenario fall outside of the traditional class of successive representation cases that were considered in *Mickens*.

Attorney Murphy's representations of Moss and Kohn differed from the traditional successive representation scenario in that they shared more than a substantial relatedness- they were nearly identical. Attorney Murphy's representations occurred during the same proceedings and arose from identical facts. This intertwining relationship posed similar concerns to those presented in cases of multiple concurrent representation, that, is, "the high probability of prejudice" and the "difficulty of proving that prejudice." *Mickens*, 122 S.Ct. at 1245. *See also Church*, 942 F.2d at 1511("[I]n the context of successive representations, we find it difficult to envision circumstances more fraught with inherent conflict than . . . where the former representation was factually intertwined with the criminal defendant's case."). While we agree that there is a lesser likelihood of prejudice in traditional cases of successive representation, such as where

the attorney is compelled to cross-examine a former client and the former representation bore only a "substantial relation" to the current proceedings, the probability of prejudice dramatically increases in circumstances where the attorney represented a co-defendant during the pre-indictment phase of the same proceeding. *Cf. Sullivan*, 446 U.S. at 347 ("The provision of separate trials for Sullivan and his codefendants significantly reduced the potential for a divergence in their interests."). This probability reaches near certainty where, as here, the attorney's former and current clients collaborate to mount a defense. This extreme likelihood of prejudice, and the corresponding difficulty in demonstrating that prejudice, warrant the application of *Sullivan* to the petitioners' claims.

Our holding that *Sullivan* applies to the petitioners' claims is buttressed by the district court's determination that "it is certainly not unlikely that, in fact, some, if not all, of the funds for representing [Kohn] came from co-defendant Moss." Third-party fee arrangements are inherently suspect, particularly when a member of the alleged conspiracy is the source of the payment. The Supreme Court made this clear in *Wood*, 450 U.S. 261, where the Court stated:

> Courts and commentators have recognized the inherent dangers that arise when a criminal defendant is represented by a lawyer hired and paid by a third party, particularly when the third party is the operator of the alleged criminal enterprise. One risk is that the lawyer will prevent his client from obtaining leniency by preventing the client from offering testimony against his former employer or from taking other actions contrary to the employer's interest.

*Id.* at 268-69. *See also Quintero v. United States*, 33 F.3d 1133, 1135 (9th Cir. 1994); *United States v. Rodriguez*, 929 F.2d 747 (1st Cir. 1991); *Danner v. United States*, 820 F.2d 1166, 1170 (11th Cir. 1987); *United States v. Shaughnessy*, 782 F.2d 118, 120 (8th Cir. 1986); *United States v.*

*Carpenter*, 769 F.2d 258, 263 (5th Cir. 1985); *United States v. Bernstein*, 533 F.2d 775, 788 (2d Cir. 1976).

Here, the government charged Moss as the leader of the conspiracy, and evidence adduced at the evidentiary hearing indicated that Moss provided the funding for Kohn's defense. Indeed, there exists ample evidence in the record indicating that Moss also paid the legal fees of other individuals involved in the conspiracy. Although Attorney Murphy denied receiving any funds from Moss, the district court found it "difficult to reconcile this testimony" with Kohn's statement "that not only did [Kohn] not pay any money to Attorney Murphy . . . [but] he was never in any financial position to do so."

We again decline to disturb the district court's finding. We note only that the district court found that it was "not unlikely" that Moss directed funds to Attorney Murphy, and a complete reading of the district court's opinion fails to clarify whether the court deemed this likelihood as amounting to a separate conflict of interest under the first prong of the *Sullivan* test. While the record provides some support for the district court's finding that Moss paid at least some part of Kohn's legal fees, we are unable to determine as a matter of law that this "likelihood" reached the level of a conflict of interest. *See, e.g., Bucuvalas v. United States*, 98 F.3d 652 (1st Cir 1996) ( finding no conflict of interest in third party fee arrangement where co-defendants had separate counsel).

We determine that Attorney Murphy's successive representations of Moss and Kohn during inextricably linked proceedings, coupled with evidence that Moss paid at least some part of Kohn's legal fees to Attorney Murphy, creates a sufficient likelihood of prejudice, as well as attendant difficulties in proving that prejudice under *Strickland*, requiring the application of *Sullivan*.

### 3.    The application of *Sullivan*

**a.**    *The first prong - an actual conflict of interest*

We now proceed to consider the first prong of the *Sullivan* test - whether Attorney Murphy's successive representations created a conflict of interest.   In order to demonstrate a conflict of interest under *Sullivan*, the petitioners "must point to specific instances in the record that suggest an actual conflict or impairment of [their] interests." *Thomas*, 818 F.2d at 481 (internal citations and quotations omitted).   They further "must make a factual showing of inconsistent interests and demonstrate that the attorney made a choice between possible alternative courses of action, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other." *Id.*   However, if the conflict is as to a matter that is irrelevant or the conflict is merely hypothetical, there is no constitutional violation.   *See Sullivan*, 446 U.S. at 350 ("[U]ntil a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance.").   *See also United States v. Hopkins*, 43 F.3d 1116 (6th Cir. 1995) (finding a hypothetical conflict where attorney simultaneously represented one client who provided information to the government inculpating another of the attorney's clients without the attorney's knowledge).

The petitioners assert that their successive representations created a conflict of interest because Attorney Murphy's competing loyalties to Moss and Kohn impaired his ability to secure plea agreements requiring cooperation.  This Court has stated that a conflict of interest occurs where defense counsel is "prevented from effectively engaging in any separate plea negotiations on one party's behalf without detrimentally affecting co-defendants." *Thomas*, 818 F.2d at 481-482. However, such cases generally have addressed scenarios where a plea offer has been extended and defense counsel either (1) is unable to accept the plea on behalf of one client out of fear of detrimentally impacting the interest of another

client; or (2) actively pressures the defendant into accepting the plea in order to ensure that defense counsel's other clients receive similar pleas.  *See Hall*, 200 F.3d at 966 (determining that a conflict of interest arose from defense counsel's rejection of a plea agreement offered to jointly represented co-defendants); *Thomas*, 818 F.2d at 481-482 (finding a conflict of interest where the prosecutor extended a "package plea" where all three jointly represented co-defendants had to accept offer; two defendants were willing to accept the offer; and defense counsel pressured the third defendant to accept plea).

In the instant appeal, the record conclusively demonstrates that AUSA Janice did not extend plea offers to the petitioners. AUSA Janice repeatedly testified that he did not extend plea offers to the petitioners and the record lacks any documentary evidence indicating the existence of such offers.[21]   As there was no plea offer, it was impossible for Attorney Murphy to either reject or accept a plea as a result of divided loyalties to Moss and Kohn.

Several unpublished decisions of this Court impliedly have indicated that a conflict of interest may arise where defense counsel's competing loyalties prevent the *exploration* of plea negotiations with the government.  *See Newman v. United States*, No. 96-6326, 1998 U.S. App. LEXIS 20565 (6th Cir. August 19, 1998) (remanding for a evidentiary hearing where counsel failed to communicate the defendant's willingness to cooperate with government authorities);  *United States v. Holt*, No. 95-5173, 1996 U.S. App. LEXIS 15631 (6th Cir. May 15, 1996) (reviewing claim that defense counsel failed to explore plea negotiations because of a conflict of interest arising from co-defendant's payment of the defendant's legal fees).    These decisions are consistent with the Supreme Court's statements in *Holloway* that, "in this case [a conflict

---

[21] It was the express policy of the United States Attorney's Office to present all plea offers in writing.

of interest] may well have precluded defense counsel . . . from *exploring possible plea negotiations* and the possibility of an agreement to testify for the prosecution, provided a lesser charge or a favorable sentencing recommendation would be acceptable." *Holloway*, 435 U.S. at 489-90 (emphasis added). Therefore, it is a reasonable expansion of prior precedent to hold that a conflict of interest arises where, as a result of joint representation of co-defendants, or successive representation of co-defendants in the same proceeding, defense counsel fails to explore possible plea negotiations.

The Court in *Holloway* established, however, an express limitation on conflict of interest claims where the claims are predicated upon defense counsel's failure to explore plea negotiations. The Court stated that such inaction may be proof of a conflict of interest only "provided a lesser charge or a favorable sentencing recommendation would be acceptable." *Id.* At a minimum, *Holloway* requires a defendant alleging that his attorney's conflict of interest prevented the exploration of plea negotiations to demonstrate that the government was willing to extend, or consider, an invitation to commence plea negotiations.

The petitioners have met this burden because it is undisputed that the government was willing to negotiate a plea with Kohn during the April, 1991 meeting between Attorney Murphy and AUSA Janice. AUSA Janice specifically testified that he did not offer a plea at the time, but "the [U.S. Attorney's Office was] willing at that point to discuss resolution by plea which included substantial assistance." Attorney Murphy also testified that "[AUSA] Janice would have been very lenient to Kohn if [Kohn] had come in."

The petitioners further have demonstrated that Attorney Murphy's successive representations prevented him from exploring possible plea negotiations with AUSA Janice. While testifying at the evidentiary hearing, Attorney Murphy

acknowledged the conflict posed by the government's requirement that Kohn cooperate against Moss:

> Q. Do you see any ethical problems with having represented Mr. Moss through at least the arraignment, taking Mr. Kohn and his offer of substantial assistance against Moss and having him cooperate.
>
> A. I suppose if there were a desire by Mr. Kohn to cooperate, if he had said, "Yes, I want to cooperate and I want to say that this guy is doing the things they said," I might have had--I would have probably had a substantial problem.

Attorney Murphy similarly testified:

> Q. [I]f Mr. Kohn would have said, "I would like to cooperate", you would have represented him, you would have gone to Mr. Janice and if an agreement would have been worked out you would have been a party to that?
>
> A. I don't know about that because of my prior dealings with Mr. Moss.

The foregoing testimony reveals that a conflict of interest arose between Attorney Murphy's successive representations of Moss and Kohn in that Attorney Murphy could not explore AUSA Janice's invitation to pursue a plea negotiations on behalf of Kohn without breaching his duty of loyalty to Moss. As such, we determine that Attorney Murphy's successive and intertwining representations of Moss and Kohn satisfy the first prong of the *Sullivan* test - a conflict of interest.

**b.** *The second prong - adverse effect*

In order for Attorney Murphy's conflicts of interest to be of a constitutional magnitude, *Sullivan* requires that the petitioners demonstrate that the successive representations

adversely affected Attorney Murphy's performance. *Mickens*, 122 S. Ct. at 1243 ( holding that the petitioner specifically must demonstrate that the conflicts "affected the counsel's performance, as opposed to a mere theoretical division of loyalties."). The showing must be that "counsel was influenced in his basic strategic decisions by the interests [of the former client]," as where the conflict "prevents an attorney . . . from arguing the relative involvement and culpability of his clients in order to minimize the culpability of one by emphasizing the other." *Wheat v. United States*, 486 U.S. 153, 160 (1988). *See also Thomas*, 818 F.2d at 481 ("The Appellants . . . must demonstrate that the attorney made a choice between possible alternative courses of action, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other."); *See also Amiel v. United States*, 209 F.3d 195,199 (2d Cir. 2000) ("To show a lapse in representation, a defendant need not demonstrate prejudice -- that the outcome of her trial would have been different but for the conflict -- but only 'that some plausible alternative defense strategy or tactic might have been pursued but was not and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.'") (Citation omitted).

The petitioners advance separate arguments regarding adverse effect, and we address each in turn.

*Kohn's allegations of adverse effect*

Kohn alleges that the successive representations adversely affected Attorney Murphy's ability to explore plea negotiations because Attorney Murphy knew that any plea offer would require Kohn to testify against Moss. Kohn specifically alleges that Attorney Murphy's failure to explore plea negotiations precluded him from receiving a plea agreement similar to that received by Jaeger, which resulted in a sentence of thirty-six months, rather than the 188 month sentences that Kohn actually received.

The district court considered Kohn's claim of adverse effect and determined that Attorney Murphy's unwillingness to explore plea negotiations did not derive from successive representation, but, rather, resulted from Kohn's desire to pursue a defense of innocence. The district court expressly determined, "any choice by Attorney Murphy to forgo initiating plea negotiations was not harmful to the [Kohn]" because "[Kohn] would not have entertained the idea of pleading guilty and testifying against co-defendant Moss." Furthermore, the district court discredited Kohn's testimony that he was willing to plead guilty and cooperate with the government. The district court stated, "the [c]ourt is mindful of the fact that [Kohn] acknowledged that when it was in his interest to do so, he gave false testimony under oath at trial."

The record supports the district court's finding. For instance, Kohn testified and maintained his innocence at trial. In addition, Attorney Murphy testified:

> [Kohn] had a relationship with Mr. Moss, an ongoing relationship with Mr. Moss as I recall . . . . they had been friends and had a business relationship of some sort for many years, . . . early on [Kohn] says, "This is my relationship with Bob Moss. I don't know what these guys are talking about. They are not telling the truth. I didn't do anything like that." So how's he going to cooperate. So I didn't think early on that there was going to be a possibility he could cooperate with the government. As you know that's a position that's fluid.
>
> . . . .
> Mr. Kohn in every instance where I broached the subject said he would never cooperate against Mr. Moss.

Attorney Murphy further testified that, "[i]f Mr. Kohn had expressed his desire to cooperate, I would have been knocking on Mr. Janice's door the next morning."

On appeal, Kohn accounts for his perceived unwillingness to enter into a plea agreement by alleging that his

disinclination derived from Attorney Murphy's misadvice regarding his sentencing exposure. Kohn specifically alleges: (1) that Attorney Murphy immediately rejected a 5 year plea offer from AUSA Janice; (2) that Attorney Murphy stated, "a five year plea offer would amount to no offer at all because that's all [Kohn's] exposure is [sic] would be five years"; and (3) Kohn elected to go to trial because Attorney Murphy's advice led him to believe that his sentencing exposure was similar whether he pleaded or was convicted at trial.

Kohn's argument is a modified version of the "Lack of Advice Sentencing Exposure" claim presented in his initial § 2255 motion. The district court rejected this claim based, in significant part, on its finding that AUSA Janice never extended a plea offer. In so doing, the district court reasoned that Kohn failed to demonstrate prejudice under *Strickland*, in that "Attorney Murphy's allegedly incorrect advice could not have influenced [Kohn's] decision to accept a plea offer, because, as the [c]ourt has already indicated, there was never any plea offer to accept."

Kohn again relies on Attorney Murphy's purportedly erroneous advice regarding sentencing exposure, but re-characterizes the claim as one arising from a conflict of interest. Kohn now contends that he failed to express a willingness to enter into a plea agreement because a *conflicted* Attorney Murphy provided erroneous advice regarding sentencing.

Kohn's re-characterization of the claim is of significant analytical import because, by couching his claim in terms of a conflict of interest, Kohn invokes an entitlement to the *Sullivan* presumption of prejudice.

In *Thomas*, 818 F.2d 476, this Court observed that "[j]ust as the *Strickland* standard has to be adapted to the guilty plea context, so must the *Culyer [v. Sullivan]* standard be

adapted."[22] *Id.* The Court determined that, in order to prevail on a claim of ineffective assistance of counsel as a result of a conflict of interest, a petitioner who has entered a guilty plea must establish: "(1) that there was an actual conflict of interest; and (2) that the conflict adversely affected the voluntary nature of the guilty plea entered by the defendants."[23] *Thomas*, 818 F.2d at 480 (citation omitted).

It is a reasonable extension of *Thomas* to hold that, in order to prevail on a claim of ineffective assistance of counsel, a petitioner who asserts a conflict of interest caused his counsel

---

[22] The *Thomas* court acknowledged that courts impose a modified *Strickland* standard in circumstances where a petitioner asserted that his counsel was constitutionally ineffective for encouraging him to plead guilty, or where the petitioner alleged that the his counsel was constitutionally deficient for encouraging him to reject a plea offer and proceed to trial. In the former instance, to prevail on a claim of ineffective assistance, the courts required that the petitioner demonstrate that his counsel's performance was deficient and that "there is a reasonable probability that, but, for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). Conversely, in *Turner v. Tennessee*, 858 F.2d 1201 (6th Cir. 1991), this Court determined that where a petitioner claims that his counsel was ineffective for encouraging him to reject a plea bargain, the petitioner must demonstrate: (1) deficient performance on the part of counsel; and (2) "but for counsel's advice, there is a reasonable probability that he would have pleaded guilty." *Turner*, 858 F.2d at 1205-06.

[23] We observe that *Thomas* requires the petitioner to first demonstrate an "*actual* conflict of interest" and then demonstrate an adverse effect on the voluntary nature of the guilty plea. *Thomas*, 919 F.2d at 480. In *Mickens*, the Supreme Court clarified its prior definition of the term "actual conflict of interest" as comprising both requirements of the *Sullivan* test - a conflict of interest and adverse effect. 122 S. Ct. at 1245 n.5. An "actual conflict of interest" therefore is a term of art requiring a conflict of interest and adverse effect. In examining *Thomas*, and the cases cited therein, it appears that the "actual conflict of interest" required in the first prong of the court's test requires only that the petitioner demonstrate a real or genuine, as opposed to a hypothetical, conflict of interest.

to recommend rejecting a plea, must demonstrate: (1) that counsel labored under a conflict of interest; and (2) that the conflict of interest adversely affected counsel's recommendations regarding the plea. *Cf. Hall*, 200 F.3d at 966 (finding an actual conflict of interest where counsel jointly representing two brothers rejected a plea offer granting one brother a minimal sentence and the other brother a life sentence with possibility of a downward departure); *Turner*, 858 F.2d at 1205-06 (expanding the *Hill* Court's modified *Strickland* standard to claims alleging ineffective assistance of counsel arising from counsel's advice to reject a plea offer).

Kohn's claims require an additional modification of *Thomas*. The standards provided in *Thomas* and its corollary direct the court's inquiry into whether the conflict of interest adversely affected counsel's advice regarding a specific plea offer. Here, as we repeatedly have acknowledged, there was no plea offer. However, as we further have acknowledged, the non-existence of a plea offer does not preclude the court from inquiring into whether the conflict of interest adversely affected counsel's ability to explore plea negotiations with the government. Therefore, in order to prevail on a claim of ineffective assistance, a petitioner alleging that a conflict of interest prevented his attorney from exploring plea negotiations must demonstrate (1) there was a conflict of interest; and (2) that the conflict of interest prevented the attorney from exploring plea negotiations.

We recognize that we must be cautious and careful in imposing appropriate burdens not to give defendants easy avenues to obtain a second bite at the apple at the penalty stage once they have acknowledged guilt or it has been determined by the factfinders. We further recognize that the foregoing standard may engender concerns as to whether defendants will be encouraged to direct counsel to forgo plea negotiations and then seek to overturn the sentence on the basis of counsel's alleged failure to explore plea negotiations.

Three safeguards alleviate any potential windfall to defendants.

First, the foregoing standard applies only in the limited context of counsel's failure to explore plea negotiations as a result of a conflict of interest. The standard derives from that established in *Sullivan*, which the *Mickens* Court determined was exclusively limited to situations of joint representation (and the hybrid successive representation presented at bar). In all other circumstances, a petitioner alleging that his counsel failed to explore plea negotiations must fulfill the *Turner* standard: (1) deficient performance on the part of counsel; and (2) "but for counsel's advice, there is a reasonable probability that he would have pleaded guilty." *Turner*, 858 F.2d at 1205-06.

Second, as discussed *supra*, *Holloway* provides an additional safeguard in that the petitioner must demonstrate that the government was willing to accept or extend an invitation to plea negotiations.

Finally, our standard does not lower the petitioner's burden under *Sullivan*. A petitioner who alleges that a conflict of interest compelled his counsel to refrain from exploring plea negotiations still must demonstrate that an actual conflict of interest caused his counsel to forgo plea negotiations. *See Mickens*, 122 S. Ct. at 1245 ("[T]he *Sullivan* mandated inquiry does not reduce the petitioner's burden of proof; it was at least necessary, to void the conviction, for the petitioner to establish that the conflict of interest adversely affected his counsel's performance."). This causative language of *Sullivan* requires that the defendant demonstrate a nexus between the conflict and the adverse effect on counsel's performance. *See* Riggs, 209 F.3d at 833 ("Riggs has not explained any causal connection between Cox's failure to request the instruction and his prior AUSA position, his representation of Driskell's ex-wife, or his sharing office space with Kamenish and Chandler."); *Hopkins*, 43 F.3d at

1119 ("Defendant's failure to accept the plea was unrelated to the dual representation.").

Kohn's claim fails because there lacks any nexus between Attorney Murphy's conflicted interests and the alleged erroneous advice regarding sentencing. Kohn merely alleges that Attorney Murphy had conflicting obligations and Attorney Murphy provided erroneous advice regarding sentencing. Kohn fails to provide any specific and credible evidence linking Attorney Murphy's erroneous advice to the conflict of interest. Moreover, the record reveals, in any event, that it was unlikely that Attorney Murphy provided deficient advice to Kohn. The district court questioned Attorney Murphy during the evidentiary hearing:

Q. [Did you] discuss with Mr. Kohn the statutory maximum sentence he was facing if he went to trial and was convicted prior to the second superceding indictment?

A. Sure we discussed it.

Q. You remember it?

A. No. I don't remember, but you always discuss it.

Q. Based on your usual procedure what would you tell him?

A. First of all, I would say usually, "Now take it easy. This is the maximum and it's very seldom that you're going to get the maximum, but this is the statutory maximum. This is the most you could get under the worst of all circumstances. I don't think that there is any possible circumstances that would apply to you that would trigger that number, but that's the number. If you go to trial that amount that government proves, within limits, if they prove anything at all, is going to determine what your sentence is."

We addressed a similar scenario in *Gonzales v. Elo*, 233 F.3d 348 (6th Cir. 2000). There, the petitioner claimed that he was denied effective assistance of counsel by his attorney's failure to inform him that he could assert the right to testify despite his attorney's advice not to do so. 233 F.3d at 354. The magistrate judge's report, which was adopted by the district court, stated that "defense counsel did not have an independent recollection of the specific advice that he rendered to [the petitioner] on the issue of his right to testify. Nonetheless, [defense counsel] was able to testify as to his customary practice with regard to advising his clients of their right to testify in criminal matters." *Id*.

In reaching a decision in *Gonzales*, this Court noted that the trial court credited the defense counsel's testimony as to his customary practices, and discredited the testimony of the petitioner. *Id*. at 357. It then went on to find that "because this court does not disturb issues of credibility, the magistrate (and therefore the district court) did not clearly err in making his findings, and . . . Petitioner's argument thus fails." *Id*.

The ruling in *Gonzales* compels the same result in the instant case. Attorney Murphy provided testimony regarding his customary practice, and Kohn failed to present any credible evidence challenging Attorney Murphy's assertions. In addition, the district court explicitly questioned Kohn's credibility. Moreover, the record belies Kohn's testimony that he was unaware of his potential maximum exposure because Kohn signed an Acknowledgment of Indictment indicating that the maximum sentence under the initial Indictment was forty years. *Kohn*, No. 97-CV-72174-DT, 1999 U.S. Dist. LEXIS 10165 * 17. Attorney Murphy expressly testified that he discussed this Acknowledgment of Indictment with Kohn. Attorney Murphy further testified that he discussed with Kohn the potential increases in sentencing exposure as a result the greater amount of marijuana alleged in the Second Superceding Indictment. Consequently, we are unable to conclude that Attorney Murphy provided erroneous

advice to Kohn regarding potential maximum sentencing exposure.

Kohn therefore fails to demonstrate that it was Attorney Murphy's successive representations that adversely affected Attorney Murphy's ability to enter into plea negotiations. Rather, the lack of plea negotiations in this case derived from Kohn's protestations of innocence, as well as Kohn's disinclination to testify against Moss in exchange for such an agreement. As such, Kohn failed to demonstrate that Attorney Murphy's conflict of interest deprived him of his constitutionally secured right to effective assistance of counsel. Accordingly, we affirm the district court's denial of Kohn's conflict of interest claim.

*Moss's allegations of adverse effect*

Moss alleges that Attorney Murphy's successive representations adversely affected his counsel's performance in that: (1) Attorney Murphy failed to explore plea negotiations with AUSA Janice; (2) Attorney Murphy failed to seek severance; and (3) Attorney Murphy failed to pursue a defense of multiple conspiracies.

The patent deficiency in Moss's assertions is that, as discussed *supra*, Attorney Murphy terminated his representation of Moss shortly after the arraignment.[24] Because Moss fails to allege that Attorney Murphy's successive representations adversely affected his representation during the pre-arraignment stage of the proceedings, Moss's conflict of interest claim fails as a matter

---

[24]Beyond our foregoing analysis we note that under Michigan law a lawyer discontinues serving a client when relieved of the obligation by the client or the court, or upon completion of a specific legal service that the lawyer was retained to perform. *Maddox v Burlingame*, 205 Mich. App. 446, 450 (1994). The retention of alternate counsel is sufficient proof of the client's intent to terminate the attorney's representation. *Mitchell v Dougherty*, 249 Mich. App. 668, 683; 644 N.W.2d 391 (2002).

of law. *See, e.g.*, *McNeal v. United States,* 17 Fed. Appx. 258 (6th Cir. 2001) (finding no conflict of interest where the defendant's former counsel represented the primary witness against the defendant.) Accordingly, Moss is unable to demonstrate that Attorney Murphy labored under a conflict of interest that adversely affected Attorney Murphy's performance.

### 4. The trial court's failure to inquire into the alleged conflict of interest

The petitioners allege that the district court committed reversible error by failing to inquire into the Attorney Murphy's successive representations. Under *Holloway* and *Sullivan*, a trial court has the duty to inquire adequately into a trial counsel's conflict of interest if it knows or reasonably should know that a particular conflict exists. *See Holloway*, 435 U.S. at 483-84 (establishing duty); *Sullivan*, 446 U.S. at 347 (holding that a trial court must make an inquiry if it knows or reasonably should know that a particular conflict exists). However, "absent special circumstances, . . . trial courts may assume either that multiple representation entails no conflict or that the lawyer and his clients knowingly accept such risk of conflict as may exist." *Sullivan*, 446 U.S. at 347.

In *Mickens*, the Supreme Court rejected the approach of several circuits which determined that a trial court's failure to inquire into a conflict of interest compels automatic reversal of the conviction. The *Mickens* Court held that the trial court's failure to inquire into a potential conflict of interest on the part of the defendant's attorney, about which the court knew or reasonably should have known, does not automatically require reversal of the conviction, observing:

[A] proposed rule of automatic reversal when there existed a conflict that did not affect counsel's performance, but the trial judge failed to make the *Sullivan* mandated inquiry, makes little policy sense. . . . The trial court's awareness of a potential conflict neither

renders it more likely that counsel's performance was significantly affected nor in any way renders the verdict unreliable. Nor does the trial judge's failure to make the *Sullivan* mandated inquiry often make it harder for reviewing courts to determine conflict and effect, particularly since those courts may rely on evidence and testimony whose importance only becomes established at trial.

*Mickens*, 122 S. Ct. at 1246. In sum, "the trial judge's failure to inquire into a suspected conflict is not the kind of error requiring a presumption of prejudice." *Mickens*, 122 S. Ct. at 1247 (Kennedy, J., concurring).

As the petitioners have failed to demonstrate that an actual conflict of interest adversely affected Attorney Murphy's performance, we reject the petitioners' claim that reversal is warranted by the trial court's failure to inquire into the successive representations. The petitioners' argument parallels that of the argument expressly presented to and rejected by the *Mickens* Court. Accordingly, we deny the petitioners' request for an automatic reversal of their convictions.

**5. Conflict of interest arising from an alleged investigation into Attorney Murphy's conduct**

Kohn asserts a separate conflict of interest claim arising from the alleged government investigation into Attorney Murphy's role in soliciting Jaeger to bribe a potential witness. Kohn specifically asserts that the district court erred in failing to conduct an evidentiary hearing to explore his claims that Attorney Murphy labored under an actual conflict of interest as a result of this investigation.

A district court should grant a hearing on a habeas petition "unless the motion and files and records of the case conclusively show that the prisoner in entitled to no relief." 28 U.S.C. § 2255. This court reviews the district court's

decision to deny a hearing for an abuse of discretion. *Green v. United States*, 65 F.3d 546, 548 (6th Cir. 1995).

In support of his claim of a separate conflict of interest, Kohn places particular emphasis on AUSA Janice's statements to the trial court:

Let me say this is also the first case I have ever had where so many witnesses have come forward and indicated what I would consider improprieties. We need go no further than starting out with Mr. David Jaeger himself, that is already on the record, that he was solicited to come over to Mr. Murphy's office by Mr. Murphy, the two Defendants [Moss and Kohn] were waiting there, and he was solicited there to bribe another witness. I have information from other witnesses also indicating that they have been pressured by various other people, either not to testify or to testify falsely in this case, your honor.

The trial judge responded:

I am much more concerned about what you allege than about the loss of time. If this proceeding is going to be tainted or close to being tainted by pressure, by intimidation, by the rest of the things you allege, I think that something should be done by the U.S. Attorney. I want to know what you are doing about it, if you want to tell me now, but I really think that you have called to my attention something that is exceedingly serious, something that I can't let past.

Mr. Murphy then stated:

I had thought that Mr. Janice had been quite fair in characterizing the unfortunate meeting between Mr. Jaeger and myself. This had come up before and the record should reflect it has and I brought it to the court's attention

 . . . .

I brought that to the court's attention in an attempt to forestall any difficulty about the trying of this case. At that point in time Mr. Janice represented to the court that I had asked Mr. Jaeger and his lawyer to come over to my office, and that is in fact what transpired, Mr. Jaeger came over with his lawyer to my office, and I didn't solicit anyone to do anything except I wanted to speak to Mr. Kappleman. I didn't even speak to Mr. Jaeger outside of his presence. I suggest that the description that I have heard today casts a far more sinister light than the prior allegations. If we're going to try the case in that light, I wonder whether or not I can go forward. I mean if he is going to accuse me of attempting to bribe a witness or me attempting to solicit the witnesses's cooperation, then that's fine, he can do that and with his office he has the power to investigate that to the full extent that he wishes to. But I certainly cannot, I certainly cannot serve as counsel to Mr. Kohn if he is going to make those kind of allegations. I can't do it.

Kohn alleges that Attorney Murphy's concerns regarding an investigation created an actual conflict of interest where, in order to avoid an investigation, Attorney Murphy sought to curry favor with the U.S. Attorney's Office by facilitating Kohn's prosecution.

It is well-established that a conflict of interest may arise where defense counsel is subject to a criminal investigation. *Taylor v. United States*, 985 F.2d 844, 846 (6th Cir. 1993). In order to establish a conflict of interest, however, the alleging party must demonstrate a nexus between the crimes of the client and the attorney. *Id. See also Mays*, 77 F.3d at 908.

Kohn's argument fails to demonstrate a conflict of interest on several fronts. First, AUSA Jaeger immediately clarified on the record that he was not accusing Attorney Murphy of any improprieties. AUSA Janice stated:

Your Honor, I indicated and I have indicated this on the record approximately three times now, that and nothing more, that Mr. Murphy was here waiting for Mr. Jaeger and his attorney at my office, that he solicited them to come over to his office, once in his office they met with Mr. Moss and Mr. Kohn and Mr. Moss took Mr. Jaeger out for a walk, Mr. Moss and Mr. Jaeger, and it was there Mr. Moss solicited Mr. Jaeger one, not to cooperate and, two, to pay off another witness.

The Court inquired, "[d]oes that involve Mr. Murphy?" AUSA Janice responded: "I never said that."

In addition, AUSA Janice testified during the evidentiary hearing that the U.S. Attorney's Office did not launch an investigation into Attorney Murphy's activities. Kohn attempts to circumvent this adverse fact by placing emphasis on evidence indicating that Attorney Murphy had complained of an audit by the Internal Revenue Service ("IRS"). Kohn fails, however, to allege any nexus between the IRS "investigation" and Attorney Murphy's defense of Kohn. Moreover, this Court has held that an actual conflict of interest does not arise where the client and the attorney are being investigated by different authorities. *Taylor*, 985 F.3d at 846 (citing *United States v. McLain*, 823 F.2d 1457, 1463-64 (11th Cir. 1987)).

In apparent recognition of the tenuous nature of these claims, Kohn alleges that it was Attorney Murphy's fear of being investigated that created an actual conflict of interest. As evidence of Attorney Murphy's fear, Kohn contends that Attorney Murphy complained to him, Moss, and Moss's wife, regarding a "fear of going to jail" and of a fear that agents were searching his office.

There lacks any controlling authority to support the proposition that an attorney's fear of investigation may give rise to a conflict of interest. Assuming *arguendo*, that we would entertain an extension of our precedent into such a

speculative scenario, Kohn's claim nevertheless fails because he cannot demonstrate any adverse effect or prejudice as a result of the alleged conflict.[25]

Kohn presents no direct evidence demonstrating adverse effect or prejudice. Rather, Kohn invites us to infer that Attorney Murphy's conflict of interest resulted in his attempts to facilitate the government's prosecution of Kohn. While we decline to make this inference, we note that such an inference is unwarranted in light of the entirety of the record. It is reasonable to conclude that Attorney Murphy would have urged Kohn to enter into plea negotiations with the government had he wanted to improve his standing with the U.S. Attorney's Office. To the contrary, Kohn alleges throughout this appeal that Attorney Murphy actively sought to dissuade him from exploring possible plea scenarios. Consequently, there lacks any indication that Attorney Murphy's fear of a pending investigation detrimentally impacted his representation of Kohn.

Kohn further alleges that the trial court failed to conduct an appropriate colloquy with Kohn in order to ensure "the defendant is fairly apprised of the perils of having an attorney who fears that he is being investigated in connection with the same indictment, and to afford the defendant the option to change counsel." As the foregoing analysis reveals that Attorney Murphy did not labor under even a *potential* conflict of interest as a result of the alleged investigation, Kohn's claims regarding any required colloquy lack any factual or legal merit.

---

[25] As we have discussed, *supra*, the *Mickens* rationale compels our strong hesitation to apply *Sullivan* to conflicts of interest cases arising outside of the joint representation context. However, we need not decide whether to apply *Sullivan* or *Strickland* to the instant facts because, as discussed *infra*, Kohn has failed to satisfy the second prong of either standard.

Accordingly, we determine that the district court did not abuse its discretion in denying the motion for an evidentiary hearing on Kohn's claims of a conflict of interest arising from the solicitation of Jaeger.

### B.   Ineffective Assistance of Counsel

In anticipation of a decision finding an absence of a conflict of interest, Moss asserts that "if [his] Sixth Amendment right to conflict free counsel was not violated because of dual representation, his Sixth Amendment right to effective assistance of counsel was." Moss specifically alleges that Attorney Morreale rendered ineffective assistance of counsel by misadvising Moss regarding his potential sentencing exposure which, in turn, eliminated Moss's incentive to pursue plea negotiations.

As discussed *supra*, in the absence of a conflict of interest, the *Strickland* analysis applies to claims of ineffective assistance of counsel involving counsel's advice offered during the plea process. *Hill*, 472 U.S. at 58. During the plea stage, the defendant has the right to rely on counsel as a "medium" between him and the government. *See Maine v. Mouton*, 474 U.S. 159, 176 (1985). However, it is not necessary that the defendant have counsel who recommends that a plea bargain be pursued. *Cf. United States v. Cronic*, 466 U.S. 648, 657 n.19 (1984) ("[E]ven when there is a bona fide defense, counsel may still advise his client to plead guilty if that advice falls within the range of reasonable competence under the circumstances.").

A failure to provide professional guidance to a defendant regarding his sentence exposure prior to a plea may constitute deficient assistance. *Magana v. Hofbauer*, 263 F.3d 542, 550 (6th Cir. 2001) (citation omitted). As discussed *supra*, where a defendant alleges that his counsel failed to provide such guidance, a modified *Strickland* standard applies requiring the defendant to prove (1) that his counsel's performance was objectively deficient; and (2) that but for his counsel's

erroneous advice, there is a reasonable probability that he would have accepted a plea. *Id*.

The district court rejected Moss's assertions regarding the failure to pursue plea negotiations based, in part, on its finding that Moss was unwilling to enter into a plea agreement. The district court stated:

> [T]he "relevant factors" in this case warrant against a finding of ineffective assistance of counsel . . . . [Moss] asserts that had Attorney Morreale initiated plea negotiations, the Government would have offered a plea agreement that would have been acceptable to [Moss]. In support of this contention, [Moss] directs the [c]ourt's attention to the plea agreements entered into by co-defendants Newell and Jaeger . . . . There is absolutely no credible evidence in this record that leads the [c]ourt to believe that [Moss] would have accepted a similar plea agreement had it been offered.

The district court further accepted "the testimony of Attorney Morreale that throughout both pretrial and trial, [Moss] maintained that he was innocent of the charges and voiced his refusal to cooperate with the government." The district court concluded "[b]ased upon the evidence presented during the evidentiary hearing, this [c]ourt is satisfied that under the circumstances, Attorney Morreale's conduct during the plea stage did not fall below that of competent counsel. The [c]ourt is also satisfied that [Moss] has failed to establish prejudice."

On appeal, Moss fails to produce any specific and credible evidence indicating that Attorney Morreale rendered ineffective assistance by not exploring plea negotiations with AUSA Janice. Attorney Morreale repeatedly testified that he initially considered engaging in plea negotiations with AUSA Janice, but abandoned the strategy after Moss displayed a resolute unwillingness to enter into a plea agreement with the government. Attorney Morreale specifically testified:

> We discussed [a plea]. . . . [O]n every criminal case I try to develop it in two ways. I look at it from a perspective of possible plea negotiation down the line, while in the back of my mind always getting a case ready for trial in case something should fall through. I discussed the possibility with [Moss] and it became apparent to me immediately that he wasn't going to plead no matter what the offer was and no matter what I could negotiate for him or no matter how good the offer was and I had no reason to doubt him. The defense was he was innocent and that's how we worked this file completely.

Attorney Morreale further testified that Moss "wasn't going to plead no matter what" and; therefore, that "there was no point in discussing a plea offer with the government."

Similar to Kohn's assertions in the conflict of interest context, Moss concedes his lack of interest in pursuing plea negotiations but alleges that Attorney Morreale "eliminated the possibility of Moss's contemplating a plea offer by suppressing and eliminating Moss's incentive to explore such a possibility through counsel's grossly inaccurate, unresearched and ignorant advice regarding Moss's sentencing exposure." Moss specifically alleges that "based upon his attorney's advice that he could not receive more than 5 (and then 10) years, Mr. Moss chose to exercise his right to go to trial; with proper advice, his position would have been radically different and he would have wanted his attorney to pursue plea bargain possibilities."

Moss's argument fails because the record indicates that Attorney Morreale provided Moss with competent advice regarding the sentencing guidelines. Contrary to the allegations presented on appeal, Moss explicitly testified that Attorney Morreale did not provide any misadvice regarding Moss's potential sentence. In addition, Attorney Morreale testified that he was "certain" that he made the calculation of Moss's potential exposure pursuant to the guidelines and that it was his general practice to "sit down with every client and

go over the guidelines." Attorney Morreale also recalled discussing the consequences of a guilty plea with Moss, particularly the scenario that Moss could achieve a lesser sentence as a result of a deduction for acceptance of responsibility.

We determine that Moss's claims of ineffective assistance are unreasonable in light of Attorney Morreale's testimony regarding the specific discussions between him and Moss, as well as his testimony concerning his general custom and practices. *See Gonzales*, 233 F.3d at 357. Moreover, the district court explicitly questioned the credibility of Moss's testimony. Therefore, we affirm the district court's determination that Attorney Morreale provided reasonably competent representation to Moss.

### C. *Apprendi*

The petitioners' final claim is that district court erred in denying their requests for leave to amend their motions to allege a claim pursuant to *Apprendi v. New Jersey*, 530 U.S. 466 (2000). The district court denied the proposed amendment reasoning, "[b]ecause *Apprendi* does not apply retroactively to cases on collateral review, . . . the claims [p]etitioners seek to assert by amendment are futile, and therefore, [p]etitioners' motions for leave to amend shall be denied."

Federal Rule of Civil Procedure 15(a) states that leave to amend a pleading shall be freely given "when justice so requires." FED. R. CIV. P. 15 (a). However, the district court may deny leave to amend if the proposed amendment would be futile. *Head v. Jellico Hous. Auth.*, 870 F.2d 1117, 1123 (6th Cir. 1989) (quoting *Hageman v. Signal L.P. Gas, Inc.*, 486 F.2d 479, 484 (6th Cir. 1973)).

The district court properly denied the petitioners' requests on grounds of futility. While this case was pending, a panel of this Court determined that the rule of *Apprendi* is not retroactively applicable to an initial § 2255 motions such as

those filed by the instant petitioners. *See Goode v. United States*, 305 F.3d 378, 385 (6th Cir. 2002).

Accordingly, the petitioners' proposed amendment to add an *Apprendi* claim was futile and the district court appropriately denied the motion pursuant to FED. R. CIV. P. 15

### V.   CONCLUSION

In conclusion, we hold that the petitioners have failed to demonstrate that a conflict of interest rendered defense counsel's performance constitutionally inadequate. Our decision should not be construed, however, as an approval of Attorney Murphy's conduct. His successive representations of the petitioners, as well as his involvement in a suspect fee arrangement with a co-conspirator, strain to their very limits the boundaries of professional conduct. Nevertheless, for the reasons stated in the foregoing opinion, we are unable to conclude that Attorney Murphy's lack of professional conduct rendered the result of these proceedings fundamentally unfair.

Accordingly, we **AFFIRM** the decision of the district court.