RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0115p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

JAMES H. SMITH,

> *Petitioner-Appellant,*

*v.*

No. 17-4118

BRIAN COOK, Warden,

> *Respondent-Appellee.*

─────────────

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:16-cv-00533—George C. Smith, District Judge.

Argued:  June 26, 2019

Decided and Filed:  April 15, 2020

Before:  SUTTON, BUSH, and LARSEN, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:**  C. Harker Rhodes IV, KIRKLAND & ELLIS LLP, Washington, D.C., for Appellant.  Jason Manion, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.  **ON BRIEF:**  C. Harker Rhodes IV, Erin E. Murphy, KIRKLAND & ELLIS LLP, Washington, D.C., for Appellant.  Mary Anne Reese, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

─────────────

## OPINION

─────────────

LARSEN, Circuit Judge.  An Ohio jury convicted James Smith of crimes arising from twelve armed robberies that occurred over a six-month period.  After exhausting his remedies in state court, Smith filed a habeas petition in federal district court.  The district court rejected

Smith's claims but granted a certificate of appealability on three issues. Having reviewed Smith's claims, we AFFIRM.

I.

Just after 2:00 a.m. on July 12, 2012, a masked gunman attempted to rob a Red Robin restaurant in Columbus, Ohio. Two employees escaped and flagged down a nearby police officer. Police quickly converged on the restaurant and spotted a man, matching the employees' description of the robber, running away from the restaurant. As he ran, the man discarded a red sweatshirt, do-rag, black tank top, and black workers' gloves with light-colored "CAT" emblems on the backs of the hands—all of which matched descriptions of the clothes worn by the Red Robin robber. In the pocket of the sweatshirt, officers found a handgun matching the one used in the Red Robin robbery. Police soon apprehended Smith nearby. Forensic analysis found DNA material matching Smith on the sweatshirt, tank top, and handgun.

A week later, an eleven-count indictment charged Smith with crimes arising from the Red Robin incident. Smith retained Javier Armengau, a local criminal defense attorney, as defense counsel. Columbus detectives soon connected Smith to a string of similar, unsolved restaurant robberies that had occurred between February and July of 2012, which the police had dubbed the "Restaurant Closer Robberies." These robberies and the Red Robin incident displayed "a strikingly consistent method of operation." *State v. Smith*, No. 13AP-973, 2015 WL 872753, at *3 (Ohio Ct. App. Mar. 3, 2015). Each involved "the robbery of a restaurant at or after closing time"; "[t]he employees" of each restaurant, "forced at gunpoint to assist the robber, were handled in similar ways"; and surveillance tapes revealed that the robber wore similar clothing in most of the incidents. *Id.* Until Smith's arrest, police had not identified any suspects connected to these robberies.

To confirm the connection, Columbus detectives requested cell phone records for a phone number that Smith, a prior offender, had given to his probation officer.[1] The records revealed that Smith's phone had been used near the location of—and at the approximate time of—most of

---

[1]The phone itself was not linked to Smith's name because it was a prepaid "burner" phone, and the service provider did not require identifying information from subscribers.

the robberies. Smith had no cell phone with him when he was arrested, and police never located the phone, but the records showed that after Smith's arrest, no outgoing calls were made on the device and all incoming calls went to voicemail. The records also showed 4,677 calls from Smith's girlfriend to the phone during the six-month period preceding Smith's arrest. Based on the above evidence, the Franklin County Prosecutor's Office filed a new 142-count indictment against Smith for crimes arising out of the Red Robin incident and the other Restaurant Closer Robberies—nineteen separate incidents in all. The prosecution subsequently dismissed the charges connected to one of those incidents; the counts arising from the remaining eighteen robberies proceeded to trial.

In April 2013, less than a month after the superseding indictment, Smith's attorney, Armengau, was himself arrested. A grand jury ultimately indicted him for eighteen sex crimes against five women. *State v. Armengau*, 93 N.E.3d 284, 292 (Ohio Ct. App. 2017). The indictment charging Armengau, like that charging Smith, was filed in the Franklin County Court of Common Pleas and initially assigned to the Franklin County Prosecutor's office. The county prosecutor, however, immediately requested that a special prosecutor from the Ohio Attorney General's office handle the case, "in order to avoid the appearance of either favoritism or bias against [Armengau] for the reason that he is a local criminal defense attorney that practices in this court on a regular basis and has pending cases as opposing counsel with assistant prosecutors from this office." *See* Notice of Appointment of Special Prosecutor, *State v. Armengau*, No. 13CR-04-2217 (Ohio Ct. C.P. Franklin Cty. May 6, 2013). For similar reasons, all the Franklin County judges presiding over the active matters Armengau was handling as counsel recused themselves from Armengau's case, including the judge handling Smith's case (Judge Frye). *See* Request for Recusal, *State v. Armengau*, No. 13CR-2217 (Ohio Ct. C.P. Franklin Cty. June 27, 2013).

At Smith's request, Armengau continued to represent Smith in his criminal defense through the end of trial. During Smith's trial, Armengau's criminal charges were "[u]nknown to the jury." *Smith*, 2015 WL 872753, at *2. Smith (through Armengau) sought and received continuances to better prepare for trial on June 17, 2013, July 11, 2013, and August 8, 2013. *See* Docket, State v. Smith, No. 13CR-1342 (Ohio Ct. C.P. Franklin Cty. Aug. 8, 2013). Smith's

trial eventually took place at the end of September 2013, roughly six months after the superseding indictment.

At the final hearing the morning of trial, prosecutors told the judge that plea negotiations "ha[d] been very brief" because their proposed sentences were "so large in this matter that [Armengau] didn't believe any type of negotiations would be fruitful." Just that morning, the prosecutors had offered, and were still willing to accept, a plea deal resulting in twenty-seven years' imprisonment. The court then addressed Armengau, who conceded that he "did not share with [Smith] this morning that the offer was 27 years." Armengau said that "he and I had discussed before, and certainly we've been in court before and discussed [his potential sentence if convicted]." Armengau relayed that Smith was "aware of what the magnitude is of potential convictions" and said that he had not shared that morning's offer because he "just kn[e]w from our discussions before" that "there was nothing even in the 20-year range that was appealing to [Smith]." "[H]e's been in [prison] for some time," Armengau added. For that reason, Armengau "really . . . never sat down" with the prosecutors to negotiate a deal because "nothing in [his] discussions with [Smith] ha[d] led [Armengau] to believe that [a 27-year sentence] would be up for consideration." Smith was present during this colloquy and did not object to the way defense counsel characterized his thinking.

Finally, turning to Smith, the court said:

> I'm not going to take time now to have you talk any more to Mr. Armengau about a potential plea. You have time during this trial to think about it as you watch the evidence come in . . . . If you decide that you want to negotiate toward maybe pleading guilty to something in this case, tell Mr. Armengau, and we'll make sure you guys have time to talk privately, and then Mr. Armengau and you have time to talk to the prosecutors. Otherwise, we'll assume that you just simply want to go to trial. But you're facing a lot of time. If you want to at some point pull the plug and say, Okay, I'll take the deal, we'll give you time to figure out what that deal is and so forth, okay?

Smith nodded his head, and the prosecutors stated that the twenty-seven-year plea offer would "stay[] on the table," "at least for the first few days of trial." The offer apparently remained available until the jury retired for deliberations, and during seven days of trial proceedings Smith never asked for a break to discuss a possible deal with his attorney.

Per a prior agreement with Smith, the prosecution dismissed all charges related to one robbery after the close of trial. The jury ultimately convicted Smith for crimes arising out of twelve robberies and acquitted him of those arising from the remaining five. After the jury's verdicts, the judge entered bench verdicts on the prior-offender gun charges,[2] which he matched to the jury verdicts—guilty on prior offender charges arising from twelve incidents, and not guilty as to all others. Smith was sentenced to eighty-four years' imprisonment.

In November 2013, Smith (through new, appointed counsel) appealed his convictions to the Ohio Court of Appeals, which affirmed. *Smith*, 2015 WL 872753, at *3. The Ohio Supreme Court declined discretionary review. *State v. Smith*, 33 N.E.3d 67 (Ohio 2015). Smith then filed this petition pursuant to 28 U.S.C. § 2254. The district court denied relief but granted a certificate of appealability on the three issues presented in this appeal. *Smith v. Warden, Se. Corr. Inst.*, No. 2:16-CV-533, 2017 WL 4349095, at *31–32 (S.D. Ohio Sept. 29, 2017).

II.

Smith first raises a Confrontation Clause challenge to his convictions. *See* U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."). Because of the overwhelming evidence that the Restaurant Closer Robberies had in fact occurred, Armengau decided to pursue a misidentification defense. He devised a trial strategy that would focus on highlighting discrepancies in how witnesses described the robber in each incident, the differences between those descriptions and Smith, and the cell phone records connecting Smith to the robberies—a connection Armengau deemed flimsy. Consistent with this strategy, Armengau negotiated a deal whereby, for each robbery, the state would produce only a single victim and a single responding police officer to testify in person; and would dismiss all charges related to any robbery for which it could not produce a live witness at trial. All other witness descriptions, and a general description of how the robberies occurred, would be admitted as stipulations. This approach, Armengau anticipated, would minimize the jury's exposure to potentially emotional victim testimony; would cut down on the already large volume of evidence to be dumped on the jury

---

[2]On Armengau's advice, Smith waived his jury rights as to these charges for each robbery so that the jury would not receive evidence of his past convictions.

about the eighteen separate robberies; and would focus the jury exclusively on evidence relevant to Smith's only defense—that he was not the robber.

Smith argues that these stipulations violated his Sixth Amendment rights "because the trial court failed to ensure Smith understood his Confrontation Clause rights before admitting stipulated testimony from absent witnesses." In other words, Smith contends that Armengau's waiver of Smith's Confrontation rights was ineffective because the trial court did not seek a personal waiver from Smith. The state court rejected this argument:

> The third assignment of error argues that stipulations in general constitute a denial to a criminal defendant of the right to confront witnesses. We do not see this as being so. Stipulations reduce the trial to a trying of key issues, not an analysis of collateral issues. Stipulations can be to the benefit of all involved and served as a potential benefit to this defendant. Further, this issue can be classified as falling within the invited error doctrine which prohibits a party from being "permitted to take advantage of an error which he himself invited or induced the trial court to make."

> The third assignment of error is overruled.

*Smith*, 2015 WL 872753, at *5 (citations omitted).

### A.

The warden says that we may not evaluate Smith's Confrontation claim at all because it is procedurally defaulted. The Ohio Court of Appeals, according to the warden, held that the invited-error doctrine precluded direct review of Smith's Confrontation claim, and invited error constitutes an "adequate and independent state ground" for the denial. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). We disagree. For procedural default to preclude our review, the state court must have "'clearly and expressly' rel[ied] on waiver as a ground for rejecting" Smith's claims. *Coleman v. Thompson*, 501 U.S. 722, 734 (1991) (quoting *Harris v. Reed*, 489 U.S. 255, 266 (1989)). If the state court had done so, procedural default would still apply even if the state court also addressed the claim's merits—a principle known as the "*Harris* presumption." *See Harris*, 489 U.S. at 264 & n.10.

In Smith's case, however, the Ohio Court of Appeals never made a "clear and express statement" that it had actually applied the invited-error doctrine. The opinion first rejected a

substantive argument: "The third assignment of error argues that stipulations in general constitute a denial to a criminal defendant of the right to confront witnesses. We do not see this as being so." *Smith*, 2015 WL 872753, at *5. Then the opinion agnostically observed that "this issue *can* be classified as falling within the invited error doctrine which prohibits a party from being 'permitted to take advantage of an error which he himself invited or induced the trial court to make.'" *Id.* (emphasis added) (quoting *Lester v. Leuck*, 50 N.E.2d 145, 146 (Ohio 1943)). But despite indicating that invited error *might* apply, the Ohio Court of Appeals never specifically determined that invited error in fact *did* apply. In similar cases where a state court has omitted the punchline, we and our sister circuits have declined to apply procedural default. *See Clinkscale v. Carter*, 375 F.3d 430, 441–42 (6th Cir. 2004) ("Although the decision unquestionably mentions [the procedural rule] and its requirements, it also emphasizes and relies upon [the merits]. It is unclear on what ground, or grounds, the court's judgment rested. Under these circumstances, we are unable to say that the Ohio Court of Appeals' decision 'clearly and expressly states that its judgment rests on a state procedural bar.'" (quoting *Harris*, 489 U.S. at 263)); *Sanders v. Cotton*, 398 F.3d 572, 579–80 (7th Cir. 2005) (finding no procedural default where state court noted that "if an issue was available on direct appeal but not litigated, it is [forfeited]," but then "immediately proceeded to address and decide the merits" without directly saying that forfeiture had occurred). Accordingly, we may review the Confrontation claim.

B.

Before evaluating Smith's Confrontation claim, we must determine the standard of review. If the Ohio Court of Appeals adjudicated Smith's Confrontation claim "on the merits," we apply deference under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) and may grant relief only if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). If the state court did not evaluate the merits of Smith's Confrontation claim, we review that claim de novo. *Rice v. White*, 660 F.3d 242, 252 (6th Cir. 2011) (citing *Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir. 2005)).

Smith argues that the state court misunderstood his Confrontation claim and so did not reject it "on the merits." The state court described his claim as a blanket argument that

"stipulations in general constitute a denial to a criminal defendant of the right to confront witnesses." But Smith's state-court briefing presented the argument in different terms; he argued that the stipulations violated his Confrontation rights because the trial judge did not ensure he had waived those rights knowingly, voluntarily, and intelligently. Smith contends that the state court failed to "address the claim that [he] actually raised." Accordingly, says Smith, the state court did not adjudicate his Confrontation claim *on the merits* and this court should review his claim de novo. We disagree.

When a state court denies relief on a properly presented federal claim, we presume that the state court adjudicated that claim on the merits. *Harrington v. Richter*, 562 U.S. 86, 99 (2011). A petitioner may rebut this presumption only in "limited circumstances." *Johnson v. Williams*, 568 U.S. 289, 301 (2013). One such circumstance is "[w]hen the evidence leads *very clearly* to the conclusion that a federal claim was inadvertently overlooked in state court." *Id.* at 303 (emphasis added). For example, when a state court addressed *all* of the claims raised in a petitioner's original post-conviction motion but did not acknowledge *any* of the claims raised in his amended motion, we concluded that it "seem[ed] likely that the state court 'inadvertently overlooked' all of [the] claims in [the] amended motion." *Brown v. Romanowski*, 845 F.3d 703, 712 (6th Cir. 2017) (quoting *Johnson*, 568 U.S. at 303). In those striking circumstances, we held that the presumption of merits adjudication had been rebutted and we reviewed the petitioner's claims de novo. *Id.*

The Supreme Court has cautioned, however, that petitioners will rarely be able to overcome the presumption of merits adjudication. *See Johnson*, 568 U.S. at 304. *Johnson* teaches that the presumption prevails even when the state court's opinion wholly omits discussion of the federal claim. *Id.* Indeed, a state-court decision providing no reasoning at all may still be entitled to AEDPA deference. *Richter*, 562 U.S. at 100; *see also Early v. Packer*, 537 U.S. 3, 8 (2002) (noting that AEDPA "does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.").

We have held that *Johnson*'s presumption prevails when a state court imperfectly discusses, rather than omits, a petitioner's federal claim. *See McKinney v. Hoffner*, 830 F.3d 363, 368–69 (6th Cir. 2016). In *McKinney*, the state court addressed an ultimate issue (whether the petitioner's two statements had unequivocally invoked his Sixth Amendment right to counsel) without explicitly addressing a critical threshold issue (whether a police officer's intervening statement amounted to "interrogation"). *See id*. at 368; *see also Smith v. Illinois*, 469 U.S. 91 (1984) (holding that a suspect's "responses to further interrogation [after unambiguously requesting counsel] may not be used to cast retrospective doubt on the clarity of the initial request"). On habeas review, we noted that the state-court opinion had not overtly grappled with the "crux" of the petitioner's claim (the interrogation issue). *Id.* Nevertheless, applying *Johnson*, we presumed that because the state court had addressed the ultimate claim, it must have rejected the petitioner's threshold claim on the merits; accordingly, we granted AEDPA deference to the state court's adjudication of that issue. *Id.*

Courts in other circuits have applied *Johnson* in like fashion. They have applied AEDPA deference to state court decisions rejecting federal claims, despite the state court not: "show[ing] its work," *Lee v. Comm'r, Ala. Dep't of Corrs.*, 726 F.3d 1172, 1211 (11th Cir. 2013), addressing a "subsidiary argument," *Jenkins v. Bergeron*, 824 F.3d 148, 152 (1st Cir. 2016), or "describ[ing] [the] claim in precisely the manner [the petitioner] preferred," *Miller v. Thaler*, 714 F.3d 897, 901 n.3 (5th Cir. 2013). These decisions mirror our reasoning in *McKinney*, 830 F.3d at 368–69.

With those principles in mind, Smith cannot rebut *Johnson*'s presumption here. Smith's Confrontation claim was expressly discussed by the state court. *Smith*, 2015 WL 872753, at *5 ("[Smith] argues that stipulations in general constitute a denial to a criminal defendant of the right to confront witnesses. We do not see this as being so."). Although Smith contends that the state court misunderstood his claim, he has not shown that his claim was "overlooked." *Johnson*, 568 U.S. at 303. And he certainly has not provided evidence that would "lead[] *very clearly*" to that conclusion. *Id.* (emphasis added). Under *Johnson*, therefore, we must presume that the state court adjudicated Smith's Confrontation claim on the merits.

Smith's position, we acknowledge, is not entirely without support in our caselaw. We have twice concluded that a petitioner had rebutted the presumption of merits-adjudication when the state court's analysis did not "reach the core" of the petitioner's federal claim. *See Campbell v. Bradshaw*, 674 F.3d 578, 596 (6th Cir. 2012); *see also Jells v. Mitchell*, 538 F.3d 478, 505 (6th Cir. 2008). In *Campbell*, the petitioner claimed that the "the trial judge precluded him from *presenting evidence of . . .* voluntary intoxication." 674 F.3d at 596 (emphasis added). But the state court rejected the claim on the ground that the "trial court merely failed to give an *instruction*" on "specific non-statutory mitigating factors." *Id.* (emphasis added). Similarly, in *Jells*, the petitioner claimed that the prosecution had withheld *Brady* material until *after* his trial had concluded. 538 F.3d at 505. The state court, however, construed his claim as stating "that [*Brady*] evidence . . . had to be provided prior to trial, and not following the testimony of the witness on direct examination [during trial]." *Id.* (quoting *State v. Jells*, No. 72484, 1998 WL 21375, *10 (Ohio Ct. App. Apr. 30, 1998)). In both cases, we held that the state court had so fundamentally "misconstrued" the petitioner's federal claim that it was not adjudicated on the merits. *Id.*; *Campbell*, 674 F.3d at 596. Though not citing *Campbell* or *Jells*, Smith argues that we should employ similar reasoning here.

But *Campbell* and *Jells* both predate *Johnson*. Their approach is hard to reconcile with *Johnson*'s healthy presumption of merits adjudication and our application of that presumption in *McKinney*. Whatever the continued vitality of *Campbell* and *Jells*, the state court's treatment of Smith's Confrontation claim shares more with *McKinney* than with *Campbell* or *Jells*. *Campbell* and *Jells* reviewed state court decisions that purported to review a federal claim that was fundamentally distinct from the one brought by the petitioner. *See Campbell*, 674 F.3d 596; *Jells*, 538 F.3d at 505; *cf. Richter*, 562 U.S. at 98 (observing that AEDPA deference applies "whether or not the state court reveals which of the elements in a multipart claim it found insufficient, for § 2254(d) applies when a 'claim,' not a compound of one, has been adjudicated"). By contrast, the state court in *McKinney,* while skipping over the "crux" of the petitioner's argument, at least grappled with the claim before it. *See* 830 F.3d at 368–69. The same is true here.

Although the state court framed Smith's Confrontation claim as arguing "that stipulations in general constitute a denial to a criminal defendant of the right to confront witnesses," *Smith*, 2015 WL 872753, at *5, the only meaningful distinction between that formulation and Smith's is that Smith contends that stipulations violate the Confrontation Clause *without* a valid personal waiver. But the implication of Smith's argument is that virtually all stipulations (as practiced) would violate the Confrontation Clause. And the state court's discussion of the tactical advantages gained through stipulations strongly suggests that the court concluded that Confrontation rights need not be personally waived. Understood this way, the state court did not misinterpret Smith's argument so much as it failed to show its work. *Cf. Lee,* 726 F.3d at 1211. The state court's decision did not lose its entitlement to AEDPA deference merely because the court failed to articulate each step in its reasoning, s*ee McKinney*, 830 F.3d at 368, but, instead, focused on a necessary implication of Smith's claim. *See Miller*, 714 F.3d at 901 n.3 ("While the state habeas court may not have described [the petitioner's] claim in precisely the manner he preferred, it addressed the substantive legal issues he presented."). We therefore review Smith's Confrontation claim with AEDPA deference to the state court's decision.

## C.

Having determined the appropriate standard of review, we reach the merits of Smith's Confrontation claim. Because Smith's claim is subject to AEDPA deference, we may not grant relief unless the Ohio Court of Appeals' decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). This is a high bar. "The text of § 2254(d)(1) . . . suggests that the state court's decision must be *substantially different* from the relevant precedent of [the Supreme] Court." *Williams v. Taylor*, 529 U.S. 362, 405 (2000) (emphasis added). And the state court decision must contradict "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Id.* at 412. We therefore look for existing Supreme Court caselaw holding that Confrontation rights cannot be waived by counsel.

Smith points to three cases: *Brookhart v. Janis*, 384 U.S. 1 (1966), *Barber v. Page*, 390 U.S. 719 (1968), and *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973). We are not persuaded. *Brookhart* involved defense counsel's agreement to a so-called "prima facie trial." 384 U.S. at 8. Through that agreement, the defendant "in effect admit[ed] his guilt," agreed to neither "offer evidence on [his] behalf nor cross-examine any of the State's witnesses," and conceded that the prosecution "need make only a prime facie showing of guilt" rather than prove his guilt beyond a reasonable doubt. *Id.* at 8. Because those procedures were the "equivalent of a guilty plea," the Court held that the defendant personally must "intelligently and knowingly agree to be tried in [such] a proceeding." 384 U.S. at 7. Guilty pleas, we know, must be entered by the defendant, personally, knowingly, voluntarily and intelligently. *See Boykin v. Alabama*, 395 U.S. 238, 243 (1969). So too, says *Brookhart*, for a guilty plea's functional equivalent.

Smith does not argue that his trial was functionally "the equivalent of a guilty plea." He challenges the state court's admission of stipulations strategically proposed by his counsel to minimize harmful testimony and focus the jury's attention on a more viable defense. The admission of those stipulations neither contradicted nor unreasonably applied *Brookhart*'s holding. Admittedly, *Brookhart* contains dictum favorable to Smith's claim. *See* 384 U.S. at 7 ("The record shows . . . that petitioner *himself* did not intelligently and knowingly agree to be tried in a proceeding . . . in which he would not have the right to be confronted with . . . the witnesses against him." (emphasis added)). But dictum is insufficient under AEDPA. *Williams*, 529 U.S. at 412. And, as we explain below, even that dictum has been contradicted in subsequent Supreme Court decisions.

Smith's reliance on *Barber* also misses the mark. There, the Court held that the petitioner had not waived his right to confront an "available," though absent, witness at trial by declining to cross-examine him during the preliminary hearing. 390 U.S. at 725. Nothing in *Barber* turned on whether counsel or the petitioner himself had made the decision not to cross-examine. Instead, the Court reasoned that, where the witness was "available," the opportunity to cross-examine during the preliminary hearing was irrelevant for purposes of Confrontation analysis. *Id.* ("We would reach the same result . . . had petitioner's counsel actually cross-examined [the witness] at the preliminary hearing."); *see also Crawford v. Washington*, 541 U.S.

36, 68 (2004) (noting that *Barber* "excluded [preliminary hearing] testimony where the government had not established unavailability of the witness."). And although the Court noted that an effective waiver requires an "intentional relinquishment or abandonment of a known right or privilege," it did not address whether Confrontation rights are among those whose "waiver may be effected by action of counsel." *Gonzalez v. United States*, 553 U.S. 242, 248 (2008) (quoting *New York v. Hill*, 528 U.S. 110, 114–15 (2000)). Thus, the state court's decision here does not even implicate—let alone contradict—*Barber*.

Finally, *Schneckloth* cannot support Smith's claim. In *Schneckloth*, the Court addressed the hallmarks of valid consent in the context of a Fourth Amendment search or seizure. 412 U.S. at 223 ("[T]he precise question in this case . . . is what must the prosecution prove to demonstrate that a consent was voluntarily given." (internal quotations omitted)). The Court's holding therefore does not encompass the Confrontation Clause. And Smith's reliance on dictum describing the Confrontation right as a "trial right" for which heightened waiver standards apply is insufficient. *Williams*, 529 U.S. at 412.

Moreover, the Supreme Court's statements in more recent cases cut against Smith's position. For example, in *Gonzalez*, 553 U.S. at 250–51, and *Hill*, 528 U.S. at 114–15, the Court offered broad overviews of the principles differentiating tactical decisions (through which counsel may waive or forfeit certain defense rights) and fundamental rights (which a criminal defendant must personally waive). In those cases, the Court specifically identified decisions regarding "what evidentiary objections to raise" and "what agreements to conclude regarding the admission of evidence" as tactical in nature, and therefore within counsel's control. *Gonzalez*, 553 U.S. at 248 (quoting *Hill*, 528 U.S. at 114–15). Indeed, the Court repeated this language just two terms ago, once again explaining that while "[s]ome decisions . . . are reserved for the client—notably, whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal," "[t]rial management," including "evidentiary objections" and "agreements . . . regarding the admission of evidence," "is the lawyer's province." *McCoy v. Louisiana*, 138 S. Ct. 1500, 1508 (2018). "[A]bsent a demonstration of ineffectiveness, counsel's word on such matters is the last." *Hill*, 528 U.S. at 115; *see also Gonzalez*, 553 U.S. at 256 (Scalia, J., concurring) ("I doubt many think that the Sixth Amendment right to

confront witnesses cannot be waived by counsel." (citing *Diaz v. United States*, 223 U.S. 442, 444, 452–53 (1912))).

Lower court decisions reinforce our conclusion that there is no "clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), holding that a valid Confrontation waiver requires personal assent from the defendant. Every federal circuit court of appeals with binding precedent on this issue—save one—has held that the Sixth Amendment right to confront witnesses can be waived by counsel. *See United States v. Ceballos*, 789 F.3d 607, 613–17 (5th Cir. 2015) ("[C]ounsel . . . may waive his client's Sixth Amendment right of confrontation by stipulating to the admission of evidence . . . ."); *United States v. Holmes*, 620 F.3d 836, 843 (8th Cir. 2010) ("Counsel can waive a defendant's right to confrontation . . . ."); *United States v. Gamba*, 541 F.3d 895, 900–01 (9th Cir. 2008) ("[W]e [have] determined that counsel may waive the accused's Sixth Amendment right to cross-examination and confrontation as a matter of trial tactics or strategy."); *United States v. Aptt*, 354 F.3d 1269, 1281–84 (10th Cir. 2004) ("[A]n attorney's stipulation to admit evidence is a valid waiver unless the defendant can show that the stipulation constituted infective assistance under the *Strickland* test."); *United States v. Cooper*, 243 F.3d 411, 417–18 (7th Cir. 2001) ("[A] defendant's attorney can waive his client's Sixth Amendment confrontation rights."); *United States v. Plitman*, 194 F.3d 59, 62–64 (2d Cir. 1999) ("We therefore join the majority of circuit courts of appeals and hold that defense counsel may waive a defendant's Sixth Amendment right to confrontation where the decision is one of trial tactics or strategy that might be considered sound."); *Cruzado v. Puerto Rico*, 210 F.2d 789, 791 (1st Cir. 1954) ("There is no doubt that the right of confrontation may be waived . . . [and] we do not see why counsel . . . may not make an effective waiver of this privilege.").

The only contrary circuit is our own. In *Carter v. Sowders*, 5 F.3d 975, 981 (6th Cir. 1993), we held that a defendant must "personally waive his right to confront [a witness]," and that the record must "show that [the] defendant knew or was advised of his rights" before doing so. We further said that an attorney's waiver could not bind a defendant absent the same showing—that he knew or was advised of his rights and consented to the waiver beforehand. *Id.* at 981–82. But since the § 2254(d)(1) inquiry focuses only on Supreme Court decisions,

our circuit's pre-AEDPA analysis in *Carter* is of no moment in considering whether the Ohio court failed to follow "clearly established" law.**[3]**

Nor does it matter that the Ohio Court of Appeals cited no Confrontation decisions in support of its argument. A state court decision may survive AEDPA deference without citing Supreme Court cases. *Early*, 537 U.S. at 8. As discussed above, AEDPA "does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Id.* That is the case here. The state court emphasized the ways in which stipulations might benefit a defendant: efficiency ("reduce the trial to a trying of key issues, not an analysis of collateral issues") and tactical advantage ("served as a potential benefit to this defendant"). This analysis is not contrary to relevant Supreme Court precedent. Quite the opposite. The Supreme Court's few statements on this issue sound similar themes, consistently reminding us that trial management and tactical decisions lie in counsel's domain—subject, of course, to the requirement that counsel provide constitutionally adequate assistance. *See Gonzalez*, 553 U.S. at 248–49; *Hill*, 528 U.S. at 114–15. We cannot conclude that the Ohio Court of Appeals here reached a decision that was "contrary to, or an unreasonable application of, clearly established federal law." 28 U.S.C. § 2254(d)(1). We, therefore, deny Smith's Confrontation claim.

## III.

Smith next argues that his trial attorney, Armengau, provided constitutionally ineffective trial assistance in two distinct ways. First, he says, Armengau had a conflict of interest arising from his own criminal charges, which led him to curry favor with the judge and prosecutors at Smith's expense; and second, Armengau failed to communicate a plea offer to Smith that Smith would have taken. The Ohio Court of Appeals rejected these claims because Smith had not

---

**[3]**Even if we were to review Smith's Confrontation claim de novo, *Carter* would not necessarily apply. We are not bound by published circuit precedent if intervening Supreme Court caselaw requires modification. *United States v. Lucido*, 612 F.3d 871, 876 (6th Cir. 2010). Here, *Carter* predates the Supreme Court's analysis in *Hill*, *Gonzalez*, and *McCoy*. The express statements in those cases that attorneys may waive certain rights as part of their "trial management" authority, which includes reaching "agreements . . . regarding the admission of evidence," *see McCoy*, 138 S. Ct. at 1508 (quoting *Gonzalez*, 553 U.S. at 248), seem to undermine *Carter*'s holding that a defendant must personally waive his Confrontation rights. *See Carter*, 5 F.3d at 981–82. But since we review with AEDPA deference, we do not revisit *Carter* today.

shown prejudice from any allegedly ineffective assistance, observing that "[t]he evidence that Smith was involved in a series of armed robberies was overwhelming," and "[r]eally the only question was whether Smith would be convicted . . . following a longer trial or a shorter trial." *Smith*, 2015 WL 872753, at *3. Accordingly, the court concluded that Smith had not shown that "the outcome of the trial would have been different" absent Armengau's allegedly ineffective assistance. *Id.*; *see also Strickland v. Washington*, 466 U.S. 668, 694 (1984). After reviewing Smith's claims under the appropriate standards, we agree that Smith is not entitled to relief.

## A.

Smith first argues that Armengau had a conflict of interest based on his own criminal charges, which were pending while he prepared Smith's defense. Smith says that Armengau made several decisions that harmed Smith's case, in an effort to assist Armengau's own defense. This argument goes to *Strickland*'s performance prong. Because the Ohio Court of Appeals addressed only *Strickland*'s prejudice prong, this court's caselaw requires that we review the deficient performance prong de novo. *Rayner v. Mills*, 685 F.3d 631, 638 (6th Cir. 2012) ("When a state court relied on only one *Strickland* prong to adjudicate an ineffective assistance of counsel claim, AEDPA deference does not apply to review of the *Strickland* prong not relied on by the state court.").[4]

We first address Armengau's alleged conflict of interest. Since Smith did not object to the alleged conflict at trial, he must now show that the conflict "*actually* affected the adequacy of his representation." *Mickens v. Taylor*, 535 U.S. 162, 168 (2002) (emphasis added) (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 348–49 (1980)). This means that Smith needs to show that his interests actually conflicted with Armengau's, and that, because of the conflict, Armengau made specific decisions that prejudiced Smith. *See United States v. Giorgio*, 802 F.3d 845, 849 (6th Cir. 2015) ("[A] potential conflict remains just that until it *actually* impairs the defendant's interests."). And although "[i]t is well-established that a conflict of interest *may* arise where

---

[4]We note that *Rayner* seems inconsistent with *Richter*'s express instruction that AEDPA deference applies to the entirety of a claim rejected by a state court, "whether or not the state court reveal[ed] which of the elements in a multipart claim it found insufficient, for [AEDPA] applies when a 'claim,' not a component of one, has been adjudicated." *See* 562 U.S. at 98. Nevertheless, *Rayner* purported to distinguish *Richter*, *see* 685 F.3d at 638, and its "peculiar rule" remains the law of our circuit. *Hodges v. Colson*, 727 F.3d 517, 537 & n.5 (6th Cir. 2013).

defense counsel is subject to a criminal investigation," *Moss v. United States*, 323 F.3d 445, 472 (6th Cir. 2003) (emphasis added), there was no actual conflict here.

First, Smith cannot show an actual conflict of interest because he and Armengau were prosecuted by different authorities. *Id.* (citing *Taylor v. United States*, 985 F.2d 844, 846 (6th Cir. 1993)). True, Armengau's case was originally assigned to the same Franklin County Prosecutor's office that was prosecuting Smith. But we cannot ignore that the county prosecutor requested a special prosecutor on the same day Armengau was charged and did not participate in the case thereafter. Further, although Armengau apparently claimed that the rape charges against him were "a coordinated campaign by the Franklin County Prosecutor's Office, the [Ohio] Attorney General, and the Columbus police to remove him from the practice of law because of his effective advocacy in criminal cases," *Armengau*, 93 N.E.3d at 300, Smith has presented no evidence to show this was so. Thus, there was no actual conflict because Smith and Armengau were prosecuted by different authorities.[5]

Second, Smith has failed to show any ill effect on his case stemming from the purported conflict. Smith "must point to specific instances in the record to suggest an actual conflict or impairment of his interests," in which Armengau "made a choice between possible alternative courses of action" to benefit himself at Smith's expense. *United States v. Mays*, 77 F.3d 906, 908 (6th Cir. 1996) (quotation omitted). And because "[j]udicial scrutiny of counsel's performance must be highly deferential," *Strickland*, 466 U.S. at 689, adverse effects exist only where "it is clear that the choice was *not part of a legitimate strategy*," *McFarland v. Yukins*, 356 F.3d 688, 706 (6th Cir. 2004) (emphasis added).

The adverse effects to which Smith points—such as agreeing to a "rapid" pretrial preparation schedule and implementing a stipulation-heavy trial strategy—were part of a

---

[5]We have also recognized that an actual conflict might exist where there is "a nexus between the crimes of the client and the attorney." *Moss*, 323 F.3d at 472. For example, in *Christopher v. United States*, 605 F. App'x 533, 536 (6th Cir. 2015), we found an actual conflict because defense counsel, representing an accused drug dealer, was also his client's customer; so any plea bargain requiring the accused to provide information could have incriminated the attorney. But nothing like that is present here; there was no danger that Armengau would ineffectively represent Smith based on a fear that authorities might unearth Armengau's own misconduct. *Cf. United States v. Balzano*, 916 F.2d 1273, 1293 (7th Cir. 1990); *Taylor*, 985 F.2d at 846 (citing *Balzano*, 916 F.2d at 1293). And Smith has not shown any other way in which his crimes were connected to his attorney.

reasonable defense strategy that, unfortunately for Smith, did not persuade the jury. Because of the overwhelming evidence that the Restaurant Closer Robberies had in fact occurred, Armengau devised a misidentification defense. He highlighted discrepancies in the witnesses' descriptions of the robber in each incident and the differences between those descriptions and Smith; and he argued that the only link between the various robberies (the cell phone records) was tenuous. The stipulations laying out witness descriptions and a general description of each robbery minimized the jury's exposure to potentially emotional victim testimony and reduced the already-large volume of evidence to be presented to the jurors about the eighteen separate robberies, allowing Armengau to focus the jury's attention on misidentification. Armengau also successfully kept evidence of Smith's prior felonies from the jurors by having Smith elect a bench trial on the felony gun possession counts. Smith has failed to show that a real conflict harmed his defense. Indeed, Armengau's strategy won jury acquittals for Smith on all charges stemming from five of the robberies. The prosecution also dismissed all charges from another robbery pursuant to the live-witness agreement Armengau procured for Smith—the victim slated to testify about that robbery did not appear. Because these decisions were part of a reasonable trial strategy, there was no adverse effect on Smith's defense. We find no actual conflict and therefore no ineffective assistance.

B.

Smith next argues that Armengau represented him deficiently because he never conferred with Smith regarding the state's twenty-seven-year plea offer. "[D]efense counsel has the duty to communicate formal offers from the prosecution to accept a plea," *Missouri v. Frye*, 566 U.S. 134, 145 (2012), and defendants are entitled to competent advice on whether to accept such offers. *Lafler v. Cooper*, 566 U.S. 156, 162–63 (2012). Failure to perform as constitutionally adequate counsel in either respect may violate the Sixth Amendment, but only if prejudice results. *Frye*, 566 U.S. at 147. In the plea context, the prejudice inquiry asks whether there is "a reasonable probability . . . that the outcome of the plea process would have been different with competent advice." *Lafler*, 566 U.S. at 163. Showing this requires, among other things, a reasonable probability that both "[Smith] and the trial court would have accepted the guilty plea" but for Armengau's deficient performance. *Id.* at 174.

The Ohio Court of Appeals used the wrong prejudice standard to assess Smith's claim. That court rejected all of Smith's ineffective assistance claims with the same prejudice analysis, stating that "[t]he evidence that Smith was involved in a series of armed robberies was overwhelming." *Smith*, 2015 WL 872753, at *3. But *Lafler* and *Frye* demand a different approach. Those cases specifically rejected the argument that "[a] fair trial wipes clean any deficient performance by defense counsel during plea bargaining." *See Lafler*, 566 U.S. at 169–70. Thus, the state court's prejudice analysis was "contrary to clearly established law." *Id.* at 173.

But even using the right standard, Smith cannot show prejudice. Under *Lafler* and *Frye*, he has the burden of demonstrating "a reasonable probability he and the trial court would have accepted the guilty plea" if he had been properly advised. *Id.* at 174; *see also Lee v. United States*, 137 S. Ct. 1958, 1966 (2017) (stating that assessing prejudice "demands a case-by-case examination of the totality of the evidence" (quotation marks omitted)). A reasonable probability "is a probability sufficient to undermine confidence in the outcome." *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (quoting *Strickland*, 466 U.S. at 694). And "[c]ourts should not upset a plea [or verdict] solely because of *post hoc* assertions from a defendant about how he would have pleaded but for his attorney's deficiencies." *Lee*, 137 S. Ct. at 1967. Rather, "[j]udges should instead look to contemporaneous evidence to substantiate a defendant's expressed preferences." *Id.*; *see also Neill v. United States*, 937 F.3d 671, 679 (6th Cir. 2019) ("[W]e must 'look to contemporaneous evidence to substantiate a defendant's expressed preferences.'" (quoting *Lee*, 137 S. Ct. at 1967)).

The record indicates that Smith would not have accepted the plea offer if his attorney had told him about it before the final pretrial hearing. Most important, in our view, is the fact that Smith actually *had* ample opportunity to accept or explore the plea offer but did not take it. The state court gave Smith the opportunity to pause the trial at any time to speak with his attorney about the twenty-seven-year plea offer had he so desired, but he never exercised that option. The offer remained open through the entire trial. And Smith knew how long his sentence *might* be if he lost at trial—between fourteen and twenty-four years' imprisonment for each of the eighteen robbery incidents. If the jury determined he was the robber in all eighteen incidents, he faced the

possibility of over 400 years' imprisonment. So Smith knew there was a gaping disparity between his possible sentence and the twenty-seven-year offer, and he *still* chose to roll the dice at trial. We do not think *Lafler* and *Frye* give him a do-over.

The other record evidence points the same direction. Armengau told the state court that, when he had previously discussed potential plea deals with Smith, "nothing even in the 20-year range . . . was appealing to [Smith]." Smith did not object to that statement and has put nothing in the record since to rebut it. Thus, the "totality of the evidence," *Lee*, 137 S. Ct. at 1966, strongly cuts against the notion that Smith would have taken the plea deal if properly advised, and so Smith has failed to carry his burden. We do not doubt that Smith wishes, in hindsight, he had taken the deal—his sentence is three times what it might have been. But absent evidence that Smith would have taken the deal *at the time*, he has not shown prejudice. *Id.* at 1967. We reject this claim.

IV.

We move at last to Smith's claim under *Jackson v. Virginia*, 443 U.S. 307 (1979), that the jury lacked sufficient evidence to convict him. The state court adjudicated this claim on the merits, so we review with AEDPA deference. 28 U.S.C. § 2254(d). "*Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference." *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (per curiam). The question on direct appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319; *see also Herrera v. Collins*, 506 U.S. 390, 402 (1993) (stating that *Jackson* "does not permit a court to make its own subjective determination of guilt or innocence"). The habeas posture ties our hands even tighter; we cannot grant relief simply because we would have resolved the direct appeal differently, but rather "may do so only if the state court decision was objectively unreasonable." *Coleman*, 566 U.S. at 651 (quoting *Cavazos v. Smith*, 565 U.S. 1, 2 (2011)). It was not.

The Ohio Court of Appeals' analysis faithfully tracked *Jackson*'s framework. *Compare Smith*, 2015 WL 872753, at *3–4, *with Jackson*, 443 U.S. at 319. And the court's ultimate

conclusion was reasonable.  For each of the twelve robberies that the jury apparently attributed to Smith, there was sufficient evidence to conclude that Smith was the robber.  For each incident, one or more witnesses identified the robber as an African American male of Smith's approximate height, weight, and age.  There was evidence that the gun in each incident matched the weapon Smith discarded just before being arrested.  The robber's clothing in each incident—a dark sweatshirt or heavy coat, gloves, and a mask or piece of clothing covering the face— was similar to the clothing the robber discarded while fleeing the Red Robin, and which contained DNA material matching Smith.  Surveillance video from three of the robberies captured shots of light-colored emblems on the robber's gloves that matched the "CAT" logos on the gloves the robber left behind during his flight from the Red Robbin.  Smith used his cell phone near the location of five of the robberies, close to the time at which the robberies occurred.  Furthermore, the jury could easily conclude that the phone number at issue was Smith's because he had given that number to a police officer as his own; his girlfriend had called the number 4,677 times in six months; and the phone stopped making or answering calls once Smith was arrested.

The jury also heard evidence that the modus operandi used in each robbery was functionally identical: (1) an armed robber would either confront employees in the parking lot after they had locked up for the night, or would enter an open back door after closing and confront employees inside the restaurant; (2) the robber would ask for the manager, force employees to lie down on the floor in a certain room and would demand money from the restaurant safe; and (3) the robber would have employees empty their pockets but would not carry away anything from the employees themselves.  Evidence of consistent method of operation can tend to show that a single person committed each robbery.  *See* Ohio R. Evid. 404(B) (allowing "[e]vidence of other crimes, wrongs, or acts" to prove "identity" through pattern).  The jury also heard evidence reinforcing this point when a Columbus police detective testified that "take control" or "take-over robberies"—i.e., forcing all victims to go in a certain room, lie down, or perform some other action—are "not really" common.

Smith focuses on variations between witness descriptions of the robber in each incident to discredit the prosecution's overall case.  But a court "faced with a record of historical facts that supports conflicting inferences must presume . . . that the trier of fact resolved any such

conflicts in favor of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 326. We conclude that Smith is not entitled to relief on his *Jackson* claim. "The jury in this case was convinced, and the only question under *Jackson* is whether that finding was so insupportable as to fall below the threshold of bare rationality." *Coleman*, 566 U.S. at 656. The Ohio Court of Appeals, in our view, correctly determined that the jury's verdicts did not fall below that low standard. And even if it were close, the state court's "determination in turn [would be] entitled to considerable deference under AEDPA." *Id.* We reject this claim.

\* \* \*

For the foregoing reasons, we AFFIRM the district court's denial.